DOLORES URBAS, Guardian of the Estate and Person of Mitchell S. Urbas, Jr., a Disabled Person, Plaintiff-Appellee, v. SAINTCO, INC., Defendant-Appellant.

Fifth District No. 5—91—0296

Opinion filed June 30, 1994.

Edward J. Szewczyk, of Donovan, Rose, Nester & Szewczyk, P.C., of Belleville, for appellant.

Harry J. Sterling, of Harry J. Sterling, P.C., of Fairview Heights, for appellee.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Defendant, Saintco, Inc., appeals from a judgment entered by the circuit court of St. Clair County on a jury verdict in the amount of $1,391,700 in favor of plaintiff, Dolores Urbas, guardian of the estate and person of Mitchell S. Urbas, Jr. (hereinafter Mitch), a disabled adult. On appeal, defendant contends that (1) the circuit court erred in denying its motions for a directed verdict and/or judgment notwithstanding the verdict (judgment *n.o.v.*), (2) the circuit court erred in directing a verdict against defendant on its affirmative defense that plaintiff's exclusive remedy was workers' compensation, (3) the jury reached its verdict by an impermissible quotient procedure, (4) the verdict was excessive, (5) the circuit court erred in instructing the jury, (6) the circuit court improperly restricted defendant's cross-examination of plaintiff's expert, and (7) the trial court improperly permitted a nonexpert, Mark Prosser, a licensed emergency medical technician (EMT), to express an opinion regarding the cause of Mitch's condition. We affirm.

## I. FACTS

As plaintiff aptly points out in her brief, the evidence in this case is full of inconsistencies and overlaps. Therefore, a somewhat exhaustive statement of facts is necessary for a sufficient understanding of this case and necessary to show the jury's verdict is supported by the evidence. Defendant owned and operated an adult entertainment nightclub, P.T.'s, in Sauget. Mitch was an employee of P.T.'s. On the evening of April 28, 1988, Mitch was found on the parking lot of P.T.'s in his car in an unconscious state. He had been missing since the night before when he left his shift early due to illness. Mitch was transported by ambulance to a local hospital where he was diagnosed as being in a coma. He eventually came out of the coma but suffered permanent brain damage. He has no recollection of the events surrounding the onset of his illness and did not testify at trial.

Plaintiff filed suit against defendant for Mitch's injuries. Plaintiff also filed suit against Hal Lowrie, individually, who owned 100% of the stock in P.T.'s. However, the jury returned a verdict in favor of Hal Lowrie; therefore, Hal Lowrie takes no part in this appeal. In its final version, plaintiff's complaint against defendant alleged, in pertinent part:

"4. That at approximately 10:00 p.m. on April 27, 1988, the plaintiff's ward became ill and so advised the management of the defendant.

5. That thereafter, the plaintiff's ward returned to his motor vehicle parked in the parking lot of the defendant in clear view of the defendant's agents and employees.

6. That it was the policy and practice of the defendant to provide security personnel on its parking lot to periodically check the parking lot for any disturbances and for any persons who might have become intoxicated or ill.

7. That the plaintiff's ward collapsed in his motor vehicle and remained in the same from at or about 10:00 p.m. on April 27, 1988, until approximately 10:30 p.m. on April 28, 1988, by which time the plaintiff's ward had become dehydrated from high body temperatures and suffered severe and permanent brain damage therefrom.

8. That the defendant was then and there guilty of one or more of the following negligent acts or omissions:

(a) failed to discover the plaintiff's ward while ill although he could and should have been discovered;

(b) failed to adequately patrol the parking lot of the defendant's business establishment so as to discover persons who were ill;

(c) failed to provide medical attention to the plaintiff's ward in violation of the defendant's standards, policies and procedures;

(d) failed to perform the patrol of the parking lot once it had undertaken to do so for other persons.

9. That as a result of one or more of the foregoing negligent acts or omissions, the plaintiff's ward suffered severe and permanent brain injuries and other anatomical results from dehydration and high fever ***."

Plaintiff's theory is that a duty to assist Mitch arose by virtue of defendant establishing a courtesy patrol to patrol its parking lot at P.T.'s and to render assistance to those in need. The courtesy patrol was in operation daily between 8 p.m. and 4 a.m. A copy of the written duties of the courtesy patrol was introduced at trial. Art Feole, director of operations for P.T.'s, assisted in authoring the duties of the courtesy patrol, which stated, in pertinent part:

"*RESPONSIBILITY*

*** To insure the safety of the employees, guests, P.T.'s and Roxy's property, the property of the employees and the property of the guests!

* * *

Your primary responsibility is to insure the physical safety of the arriving and departing female employees. They are to be escorted to and from the club. You must have a watch to be aware of the shift changes, which are; 8:00pm, 9:00pm, 10:00pm and closing. When escorting a lady to her vehicle always inspect the interior of the vehicle to insure no potential danger exists.

* * *

B.) If any intoxicated person leaves the club and tries to drive, be courteous, but try to discourage the person from driving. Offer to call the courtesy van or a cab. If person agrees, do not leave the person alone. Have him come back into the club with you. Contact Director immediately. He will take care of the guest from there. If the guest is belligerent and refuses your assistance, make a note who, what, where and when (be sure to include license #, color of the car, make, model, and year). Notify the Director immediately.

\* \* \*

E.) Escort *all* unescorted ladies to and from the club. This includes female guests as well as employees.

F.) At closing time Courtesy Patrol should not be outside of the club without a partner. When clearing the lots, stay close enough to assist each other, should it be necessary. All guests must be off the lot prior to any employees leaving the club. Be alert for guests waiting across the street or on one of the adjacent streets. If you suspect a guest waiting just off the property, advise the Director. If you have a guest that refuses to leave the premises advise the Director, again take notes of who, what, when, where! Any person waiting on the lot who claims to be there to give an employee a ride, take notes and verify this with the employee. If the employee verifies the ride, have the individual wait in the front of the club (Advise your partners of the status of the vehicle). If the employee denies the ride, inform the Director. Once the lot is cleared inform the Director. All female employees are to be escorted from the club to their vehicles. Escort in small groups; make sure that the people being escorted are parked in the same area. Advise the Director of any employee that just walks out without a security escort. Male employees may leave together in groups of 2 or more without a courtesy patrol. *All females* must have courtesy patrol escort. Advise the Director when all employees are escorted to their vehicles. Remember the closing time is the most critical time of your courtesy patrol shift. Always work in pairs and be aware that your fellow employees are relying on you to insure their physical safety." (Emphasis added.)

Several employees of P.T.'s testified about their understanding of the courtesy patrol.

Harold Lowrie said it was the function of the courtesy patrol to protect employees and their property. Larry Tyler, supervisor of P.T.'s at the time in question, testified that the courtesy patrol operated to greet people, survey parking areas, assist patrons, and patrol the area. Tom Kelly, manager of P.T.'s at the time in question, testified that the courtesy patrol operated to greet guests, escort

entertainers to cars, and secure the parking lot. Kelly added that courtesy patrolmen had no duty to patrol the lots; however, some patrolmen did patrol the lots while others did not. John Kistner, a bartender at P.T.'s for seven years, testified that it was the duty of the courtesy patrol to ensure that the female employees of the club were able to get into and out of the club without incident. He also stated that he believed it was the patrolmen's responsibility to go up and down the lot looking into cars. Christine Kufskie, a waitress at P.T.'s for five years, testified it was common practice for the courtesy patrolmen to go up and down the parking lots checking the cars. Michael Bloodworth, who occasionally worked as a courtesy patrolman at P.T.'s, would look into the cars of the entertainers he was escorting to their cars. As the written responsibilities indicate, closing time at P.T.'s is most critical, and all witnesses agreed that extra precautions were taken at that time to ensure employees' safety.

At trial, conflicting evidence was adduced as to Mitch's activities on the night of April 27, 1988. By all accounts, Mitch was to work from 8 p.m. to 4 a.m. as a courtesy patrolman. As usual, Mitch reported early for work, somewhere between 7 and 7:30 p.m. Sometime between 8 and 9:30 p.m., Mitch told his supervisor, Tom Kelly, that he was not feeling well and wanted to go home. According to Kelly, Mitch waited for his replacement until 10 or 10:30 p.m., at which time Kelly walked Mitch to his car and watched him exit P.T.'s parking lot and drive down Monsanto Avenue to Route 3. Kelly reported that even though Mitch did look ill, he watched Mitch leave because it was his experience that employees would feign illness and then retreat to a bar on the corner of Route 3. Kelly wanted to make sure that that did not happen with Mitch. Kelly testified that he did not see Mitch until the next evening when he discovered Mitch lying unconscious in his car. According to Kelly, Mitch's car was in a different spot on April 28 and facing a different direction than it had been on April 27.

Mitch's car was in the repair shop earlier on April 27. The mechanic who worked on the car testified that he wrote down the odometer reading when Mitch dropped off his car. After completing the repairs, the mechanic test-drove the car exactly 3.8 miles. Mitch picked up his car from the mechanic at 5 or 5:30 p.m. Mitch's mother testified that Mitch ate dinner at home and then left at approximately 6 p.m. Mitch's girl friend picked up his car at P.T.'s parking lot on Friday, April 29. At that time, there were 73 more miles on the odometer than when Mitch dropped off his car at the mechanic's shop. Accounting for the mileage between Mitch's home, the garage, and P.T.'s, Mitch's car was driven an additional 50 miles.

Two Sauget police officers, Parisi and Lee, who were working the 11:30 p.m. to 7:30 a.m. shift, testified that they saw Mitch at the entrance of P.T.'s performing his duties as courtesy patrolman at approximately midnight. Mitch explained he did not feel well and was waiting for a relief worker so he could leave. Another Sauget police officer, Ed Bastin, went to P.T.'s on the evening of the 28th around 8 p.m., inquiring as to Mitch's whereabouts after the Sauget police department received a call from Mitch's mother concerned about Mitch's well-being. According to Bastin, he was informed by Tom Kelly and the doorman for the evening that no one had seen Mitch since 8 a.m. that morning. The doorman then went out on the lot to assist Officer Bastin in locating Mitch's car. Bastin testified that Mitch's car was not on the lot at that time. Kelly denied telling Bastin that he had not seen Mitch since 8 a.m. that morning. Kelly insisted that he did not see Mitch after he left on April 27 until he found Mitch unconscious on April 28.

Another employee of P.T.'s, Otis Bloodworth, testified that he relieved Mitch on the evening of April 27. Bloodworth was supposed to get off at 8 p.m. but stayed until another worker could arrive to take Mitch's place. According to Bloodworth, Mitch left around 8 p.m. with another man. Bloodworth saw Mitch's car return sometime before midnight. At that time, the man who left with Mitch returned to P.T.'s. Mitch's car then drove away again. Bloodworth could not say if Mitch was in the car at that point. Because it was Mitch's car, Bloodworth assumed that Mitch was driving it at that time. On the following morning, Bloodworth returned to work sometime between 11 and 11:30 a.m. At that time Bloodworth noticed Mitch's car parked in the employee parking lot. Throughout the day, according to Bloodworth, at least three persons telephoned P.T.'s to inquire about Mitch's whereabouts. Bloodworth went to the bank at approximately 4 p.m. on the 28th, and Mitch's car was on the parking lot at that time, but it was now in a different parking space than it was when Bloodworth arrived that morning. Upon Bloodworth's return from the bank, Mitch's car was again in another parking space. Bloodworth testified that Mitch's mother and girl friend came to P.T.'s inquiring about Mitch's whereabouts. Bloodworth told both to talk to the director. Bloodworth testified that Mitch's car was still on the parking lot when Bloodworth left at approximately 8 p.m. on April 28.

Both Mitch's mother and his girl friend denied talking with Bloodworth on April 28. Mrs. Urbas testified that she did call P.T.'s, as well as the Sauget police department, attempting to locate her son. Connie Arnold, Mitch's girl friend, also made some telephone

calls attempting to locate Mitch. Larry Tyler, supervisor of P.T.'s, testified he went to P.T.'s at approximately 9 or 9:15 a.m. on April 28. At that time, Mitch's car was not on the parking lot. Tyler further testified that he received a call from Mitch's mother between 12:15 and 12:30 p.m. Mrs. Urbas was concerned because Mitch did not come home from work the previous evening. Tyler returned to P.T.'s about 1:30 p.m. in an attempt to locate Mitch but did not see Mitch's car on the parking lot. Mrs. Urbas testified she called Tyler at approximately 11 a.m. on the 28th to say Mitch did not return from the previous evening. Tyler told her he would go to P.T.'s and look for Mitch. Tyler called Mrs. Urbas back and told her no one had seen Mitch and his car was not on the parking lot. Art Feole, director of operations for P.T.'s, went to P.T.'s between 8 and 10 a.m. on the 28th. According to Feole, Mitch's car was not on the lot at that time.

Ultimately, Mitch's girl friend called her friend, Kathy Prosser, whose husband was an O'Fallon police officer. Kathy's husband, Mark Prosser, went down to P.T.'s in an attempt to locate Mitch. According to Officer Prosser, he received a description of Mitch's car and the license number from Mitch's girl friend. At about 10:15 p.m. Prosser entered P.T.'s parking lot and immediately spotted Mitch's car. Prosser assumed Mitch was inside the club, so he went to the front door and asked to speak to him. The doorman informed him Mitch was not on duty that night but would be back the next evening. Prosser then identified himself as a police officer and was escorted inside. Prosser asked to see the manager that evening and was introduced to Tom Kelly. Kelly informed Prosser he had not seen Mitch since approximately 10:30 the previous evening when Mitch went home due to illness. According to Prosser, Kelly looked surprised when he told him that Mitch's car was on the lot. Prosser and Kelly then went out to Mitch's car, where they discovered Mitch in the front seat.

The window on the passenger side was open somewhere between three and five inches. Kelly was able to get his hand in and unlock the door. Both Kelly and Prosser felt a rush of hot air when the door was opened. Mitch was saturated with perspiration, but his skin was cold and clammy. Mitch was dressed in an orderly fashion with no signs of trauma. The keys to the car were lying on the floorboard under the steering column. According to Kelly, Mitch was in the passenger seat with his head down to the right resting on the door. Kelly testified that Mitch was not slumped down, so that if a person walked by the car, he or she would have been able to see Mitch in the front seat. Mitch was wearing his tux suit and dark pants, which were part of his work uniform. Kelly explained that when the door to

the car was opened the heat "rolled out" and hit him in the face. Mitch was drenched with perspiration, and there was a strong odor of urine. Kelly stated that no part of Mitch's buttocks were over by the driver's side of the car.

Prosser, an O'Fallon police officer with specialized training as an EMT, testified that it looked to him like Mitch got in behind the steering wheel and just rolled onto his right side. Mitch's head was against the passenger door. Once Kelly and Prosser opened the door of the vehicle, Prosser also felt the heat roll out of the vehicle. Prosser took hold of Mitch's head to stabilize it. Mitch's skin was cold and clammy, and Prosser could feel the heat coming from within Mitch's clothing. Prosser opened Mitch's collar and loosened his clothing to ventilate Mitch as per his EMT training. Prosser testified that Mitch was wearing a police winter jacket, almost a uniform-type, a white tuxedo shirt, and black pants with a thermal long-john top underneath. Prosser saw no signs of trauma and found Mitch to be dressed in an orderly fashion. According to Prosser, Mitch's wallet was completely saturated with perspiration or some sort of body fluid. The leather was nearly melted and like putty in his hands. Kelly, on the other hand, does not remember the wallet being like putty or even being wet or drenched. Prosser opined that based upon his experience as an EMT it appeared to him that Mitch had probably been in the sun the entire day. When Prosser and Kelly were unable to get any response from Mitch, an ambulance was summoned.

Mitch was transported to St. Mary's Hospital in East St. Louis. The ambulance drivers testified from their report that they were contacted at approximately 11:10 p.m. on April 27, to respond to an emergency at P.T.'s. Upon their arrival at approximately 11:15 p.m., they found Mitch unconscious in the front seat. The ambulance crew found Mitch sitting in the driver's seat slumped over with his head toward the passenger door. Mitch was having difficulty breathing, but there were no visible signs of injury. Mitch was cyanotic, bluish in color, which can be caused by a lack of oxygen. He was cold and clammy to the touch, but his clothes were drenched in sweat.

Upon arrival at the hospital, Mitch was examined by Dr. Sana Ullah at 11:33 p.m. Dr. Ullah testified that Mitch was in a coma and was running a temperature of 103.1° Fahrenheit. No signs of trauma were visible, but Dr. Ullah discovered red excoriated areas on both sides of Mitch's waistline, which he opined were caused by sitting in one position for 8 to 12 hours or more in tight pants. Dr. Ullah ordered that the drug Narcon be administered to counteract any effects of narcotics. It was later determined through blood and urine tests that Mitch had not ingested any alcohol or narcotics. A battery

of tests was performed on Mitch. Based upon the results, Dr. Ullah was unable to rule out any trauma or damage to the brain and any bleeding of the brain. Dr. Ullah's diagnosis consisted of coma and pneumonia, but beyond that, he was unable to make any diagnosis. At 2:40 a.m., Mitch was transferred to St. Elizabeth's Hospital in Belleville.

Upon arrival at St. Elizabeth's, Mitch was examined by Dr. John Boeren, who specializes in family practice. In addition to the information provided from St. Mary's Hospital, Mitch's family told Dr. Boeren that Mitch suffered from cold or flu-like symptoms for a week preceding the incident. Dr. Boeren testified that Mitch was dehydrated and had an electrolyte imbalance due to lack of liquid intake. Dr. Boeren also found a discolored or bruised area over the upper and mid portion of Mitch's buttocks in the sacral area. Dr. Boeren testified that this injury was caused by the pressure of sitting in the same position for at least a 24-hour period. Dr. Boeren testified that the results of an electroencephalogram performed on Mitch showed:

> "moderately severe generalized dysrhythmia non-focal, *** a generalized flowing of the electrical brainwave activity which could be due from any of a lot of causes. It was not consistent with any kind of tumor or trauma, but rather, just depression of brain function. This could be due to lack of oxygen. It could be due to poisonous substances. It could be possibly due to infection in the brain. There are a lot of things that might cause this."

Additional tests were run on Mitch, but everything came back negative. There was no evidence of a recent viral infection. Mitch remained in intensive care for an extended period of time after which he was transferred to a Veterans Administration Hospital in St. Louis, Missouri. Two or three days prior to his transfer, Mitch suffered a grand mal seizure.

Dr. Boeren testified that he believed the dehydration played a part in Mitch's injuries. If Mitch had a viral infection and a fever and was also placed in a hot car that sat in the sun all day, the failure to render or delay some sort of medical assistance might or could have aggravated Mitch's condition. Dr. Boeren believed that the electrolyte imbalance found in Mitch could have been the result of dehydration. According to Dr. Boeren, Mitch suffered some sort of neurologic brain insult, injury, infection, or toxin which rendered him unable to drink, thereby causing him to become dehydrated. Dr. Boeren believed that dehydration was secondary to some sort of neurologic injury or impairment and adding dehydration on top of that "could worsen it." On cross-examination, Dr. Boeren admitted that he did not have an opinion to a reasonable degree of medical certainty

why Mitch was in a coma when he saw him, why Mitch went into that coma, or at what moment Mitch suffered permanent brain damage.

Dr. Ronald Welch, a neurologist who consulted with Dr. Boeren on Mitch's case, made the following diagnosis:

"I felt he had a metabolic encephalopathy. It was some sort of extraneous cause. The most likely thing, in view of the fact he had bitten his tongue, is that he had a seizure. Now the cause of that seizure, I couldn't tell you based on when I examined him at that time. All the tests that came back were normal from my viewpoint, the neurologic testing, so I was unable to formulate the cause basically."

Dr. Welch opined that if Mitch suffered some sort of medical problem resulting in the encephala from which Mitch suffered and then was left in a car for 24 hours, such inattention could certainly aggravate or contribute to the encephalopathy. There was a discussion whether Mitch suffered from hyperthermia. Dr. Welch stated it would be easily determined by Mitch's temperature at the hospital. On cross-examination, Dr. Welch admitted that, since he did not know what caused Mitch to go into a coma and suffer brain damage, he would only be guessing if he said it would have been medically beneficial for Mitch to have been found five minutes or five hours after the occurrence. Moreover, Dr. Welch could not specifically say whether high temperatures caused Mitch to go into a coma and suffer brain damage.

Dr. Carl Berg saw Mitch when Mitch was transferred to the Veterans Administration Medical Center nearly one month after his original injury. Dr. Berg was intrigued with Mitch's case because no one was ever able to formulate an opinion as to the cause of Mitch's original problem. Dr. Berg was also unable to determine the exact cause. Dr. Berg described a purplish bruise which extended around Mitch's waist. Berg also described a small decubitus ulcer on Mitch's buttocks presumed to be from prolonged immobilization at sometime prior to Dr. Berg's examination. Dr. Berg believed that Mitch suffered some diffuse brain injury caused by either not enough oxygen or not enough blood, but he could not say what the primary event was that caused the damage. Dr. Berg could not say whether it would have made a difference in this case whether Mitch had been found and treated earlier. He could say that there are scenarios in which a difference in treatment from five minutes to five hours might have made a difference and other instances in which it would have made no difference.

Dr. Joseph Prosser, board certified in internal medicine and criti-

cal care medicine, also treated Mitch. Dr. Prosser first saw Mitch on July 7, 1988, when Mitch was admitted to Parkview Nursing Home. Dr. Prosser discussed the decubitus ulcers Mitch developed. Dr. Prosser surmised that if Mitch was lying in one position for an extended period of time in the car, he may well have developed sufficient necrosis to cause a breakdown of the skin and an ulcer. Dr. Prosser was also questioned about anoxia, deprivation of oxygen to the brain. Dr. Prosser explained that with total deprivation, permanent, irreversible brain damage occurs within approximately four minutes. Dr. Prosser refused to speculate about partial or intermittent blood flow. Dr. Prosser also discussed hyperthermia and could not say, if a person was brought into the hospital with a temperature in the range of what Mitch had on April 27, whether such person might have suffered from hyperthermia. Dr. Prosser deferred to a neurologist on such matters.

Dr. Mary Elizabeth Case, a forensic pathologist, testified for defendant. Dr. Case reviewed all of Mitch's medical records. In her opinion, based upon the markings found on Mitch's body, there was no way to determine with any certainty that Mitch was in a stationary position for a prolonged period of time versus a shorter period of time. Dr. Case opined that a tight belt could cause markings in a short period of time and that since Mitch lost bladder control when he became unconscious, his pants were wet, and in such a condition, it probably did not take long to cause the excoriated area on Mitch's buttocks. Dr. Case disagreed with those doctors who attempted to fix the time it took to produce such markings and believed no one could say with any degree of medical certainty how much time a person would need to be in a fixed position for such markings to occur. Dr. Case opined that neither hyperthermia nor dehydration affected Mitch in any way that caused brain damage. Based upon the temperatures on April 27 and 28, Dr. Case felt that there was no way that the car heated up sufficiently to cause Mitch's temperature to be elevated to 106° Fahrenheit. The parties stipulated to the following temperatures in the weather:

| DATE | TIME | TEMPERATURE (F) |
| --- | --- | --- |
| April 27 | 9:55 p.m. | 53 |
| April 27 | 10:55 p.m. | 49 |
| April 27 | 11:55 p.m. | 51 |
| April 28 | 0:55 a.m. | 50 |
| April 28 | 3:55 a.m. | 69 |
| April 28 | 4:55 p.m. | 68 |

| April 28 | 5:55 p.m. | 65 |
| April 28 | 6:55 p.m. | 62 |
| April 28 | 7:55 p.m. | 56 |
| April 28 | 8:55 p.m. | 51 |
| April 28 | 9:55 p.m. | 50 |
| April 28 | 10:55 p.m. | 48 |
| April 28 | 11:55 p.m. | 44. |

Dr. Case believed Mitch suffered only a mild degree of dehydration based on his blood sodium level and his blood urea nitrogen level. Dr. Case considered the possibilities of what happened to Mitch to produce the damage to his brain, but she could not say within a reasonable degree of medical certainty what occurred. Dr. Case agreed that if someone is injured or ill, it is best to render medical assistance as soon as possible. Dr. Case disagreed with hypoxic encephalopathy as the primary diagnosis for Mitch. Dr. Case testified that she could only speculate as to whether Mitch would have recovered more successfully had he been treated earlier because she was unsure of the underlying cause of his brain damage. Dr. Case did agree that Mitch's skin condition, the decubitus ulcers, would have been less severe had they been treated earlier.

Evidence was presented on the issue of damages. Dr. Leonard Grossman, an economist, testified to Mitch's lost income and future lost earnings. The trial court refused to allow Dr. Grossman to be cross-examined about the adverse effect of a prior felony conviction; however, an offer of proof was made. Mitch was convicted of armed robbery and use of a deadly weapon in January 1982. An *in limine* order was entered prior to the start of trial prohibiting discussion of these convictions because they were found to be remote in time and irrelevant to the instant action. Ultimately, the jury returned a verdict in the amount of $1,391,700. Defendant filed a post-trial motion raising numerous issues. The trial court denied defendant's post-trial motion, and defendant now appeals. Additional facts necessary for an understanding of this case are addressed in the issues portion of this opinion.

## II. ISSUES

We first consider whether the trial court erred in refusing to direct a verdict or enter a judgment *n.o.v.* in favor of defendant. The law is well settled that verdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on the evidence

could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.

## A. DUTY

To recover on the theory of common law negligence, there first must exist a duty or obligation requiring one to conform to a certain standard of conduct for the protection of another against an unreasonable risk. (*Barnes v. Washington* (1973), 56 Ill. 2d 22, 305 N.E.2d 535.) Plaintiff must also allege and prove a breach of that duty and that the breach was the proximate cause of plaintiff's injuries. (*Wojdyla v. City of Park Ridge* (1992), 148 Ill. 2d 417, 421, 592 N.E.2d 1098, 1100.) The existence of a duty is a matter of law to be determined by the court, while the questions of whether the duty has been breached and whether the breach proximately caused an injury are factual matters to be determined by the jury. *First National Bank v. City of Aurora* (1978), 71 Ill. 2d 1, 12, 373 N.E.2d 1326, 1331.

In *Nelson v. Union Wire Rope Corp.* (1964), 31 Ill. 2d 69, 74, 199 N.E.2d 769, 773-74, our supreme court gave recognition to the principle that liability can arise from the negligent performance of a voluntary undertaking. (See Restatement (Second) of Torts § 324(a) (1965).) Defendant contends that no evidence was presented to support plaintiff's allegation that defendant voluntarily assumed a duty to plaintiff to check the interior of parked automobiles while checking the lot. While the courtesy patrol did check the interior of cars, P.T.'s also voluntarily assumed a duty to ensure the safety of their employees and patrons.

■ It was the common knowledge of all witnesses that P.T.'s parking lot was a place teeming with potential trouble. For example, a Sauget police officer, Ed Bastin, testified that during a routine shift, he drives through P.T.'s parking lot approximately 12 times. On such occasions, he comes into contact with intoxicated persons, "people sleeping off a drunk," and people fighting. According to Bastin, there is a drug overdose on the parking lot at least once a week. Additional witnesses discussed the problems with vandalism and the need to protect the dancers and all employees. In fact, the written duties of the courtesy patrol state that it is the responsibility of the courtesy patrol to "insure the safety of the employees [and] guests" of P.T.'s. The written responsibilities also state that at closing time extra care is to be taken to ensure the safety of P.T.'s employees.

Employees of P.T.'s testified as to their understanding of the duties of the courtesy patrol. Tom Kelly, Mitch's supervisor, testified that the basic function of the courtesy patrol was to secure the parking lot. He testified that on one occasion he checked the interior

of an automobile. John Kistner, an employee of P.T.'s, believed that it was the responsibility of the courtesy patrol to go up and down the parking lots looking into cars. There is every indication in the instant case that the courtesy patrol's main reason for being was to protect both the employees and the patrons of the club from all types of harm that might befall them on the parking lots. (For a contrary holding, see *Yassin v. Certified Grocers of Illinois, Inc.* (1986), 150 Ill. App. 3d 1052, 502 N.E.2d 315, where the inspection of a meat tenderizer machine which injured the plaintiff was not done to ensure the safety of patrons of a grocery store, but rather to ensure sanitation.) Evidence was adduced that the courtesy patrol was established to protect against many problems on P.T.'s parking lots and to protect those involved in such situations, particularly P.T.'s own employees. Furthermore, it is clear that P.T.'s assumed a duty in order to protect itself from potential liability in dramshop actions and other liability situations. The testimony, along with the written duties of the courtesy patrol in discussing intoxicated drivers, makes it clear that defendant was well aware of the possible danger that existed in finding those in need of medical assistance due to drug or alcohol ingestion in cars parked on the lots. While defendant initially had no duty to protect plaintiff against the situation at hand, we agree with the trial court that defendant voluntarily assumed a duty to protect plaintiff while he was on the parking lot during the time the courtesy patrol was in operation.

## B. BREACH

Next, defendant argues that even if a duty is found to exist, plaintiff's evidence on the remaining elements of a negligence cause of action was insufficient. Defendant contends that plaintiff introduced no evidence indicating exactly what defendant did wrong and, thus, failed to establish breach of a duty. For example, defendant contends plaintiff had the burden of establishing the time of his return to P.T.'s as a precondition to any conclusion that defendant was negligent in failing to find him earlier. We disagree.

■ The propriety of a directed verdict or a judgment *n.o.v.* presents the issue whether there is any evidence in the record to support the jury verdict. (*Guidani v. Cumerlato* (1965), 59 Ill. App. 2d 13, 19, 207 N.E.2d 1, 4.) Moreover, in considering this case, it must be remembered that the jury is free to disregard or disbelieve whatever facts are inconsistent with its conclusion. (*Guidani*, 59 Ill. App. 2d at 18-19, 207 N.E.2d at 4.) In the instant case, plaintiff's theory was that Mitch collapsed in his automobile at or about 10 p.m. on April 27 and was not found until approximately 10:30 p.m. on April 28, during

which time Mitch became dehydrated from high body temperature from being in a hot automobile during the day and as a result suffered permanent brain damage. Defendant's theory, on the other hand, was that some person drove Mitch around and returned back to the P.T.'s parking lot only a short time before he was discovered by Kelly and Prosser. Plaintiff presented evidence, which was indeed conflicting, about when, if ever, Mitch left the parking lot and returned to the parking lot on April 27 and what condition Mitch was in when he was found on the 28th. While defendant claims Tom Kelly's testimony about when defendant left for the evening was uncontradicted, defendant is clearly mistaken.

There was testimony from two Sauget police officers that Mitch was still waiting for a replacement to show up at midnight. Larry Tyler testified that Mitch's replacement never arrived, and thus, the jury could reasonably have concluded that plaintiff never left the lot or returned prior to the time the courtesy patrol ceased operating at 4 a.m. and, thus, should have been found by the courtesy patrol prior to its dismissal at 4 a.m. We believe the circumstantial evidence presented in this case and the inferences therefrom, when viewed in the aspect most favorable to plaintiff, make it more probable than not that defendant did, in fact, breach its duty to plaintiff by failing to properly patrol the parking lot and thereby discover Mitch, especially in light of the fact that several persons working at P.T.'s on the evening in question were aware of the fact that Mitch was ill. See *Hocker v. O'Klock* (1959), 16 Ill. 2d 414, 158 N.E.2d 7.

## C. PROXIMATE CAUSE

Defendant next contends that plaintiff failed to prove proximate cause because plaintiff failed to prove that a delay in treatment proximately caused Mitch's injuries. Defendant incorrectly asserts that none of the doctors could render an opinion as to whether earlier treatment would have been medically beneficial to Mitch or would have improved his recovery. Both parties cite numerous cases and have made numerous requests to cite additional authority, which we granted. We have reviewed all of these cases and more.

It is fundamental law that in negligence cases there may be more than one proximate cause of an injury and that one is liable for one's negligent conduct whether it contributed in whole or in part to the injury as long as proximate cause exists. (*Ray v. Cock Robin, Inc.* (1974), 57 Ill. 2d 19, 23, 310 N.E.2d 9, 11-12.) It is also well settled that the existence of proximate cause is a question of fact for the jury. (*Ney v. Yellow Cab Co.* (1954), 2 Ill. 2d 74, 84, 117 N.E.2d 74, 80.) Such issues upon which reasonable persons can arrive at different conclusions should never be determined as matters of law:

"Questions of negligence, due care and proximate cause are ordinarily questions of fact for a jury to decide. The right of trial by jury is recognized in the Magna Charta, our Declaration of Independence and both our State and Federal constitutions. It is a fundamental right in our democratic judicial system. Questions which are composed of such qualities sufficient to cause reasonable men to arrive at different results should never be determined as matters of law. The debatable quality of issues such as negligence and proximate cause, the fact that fair-minded men might reach different conclusions, emphasize the appropriateness and necessity of leaving such questions to a fact-finding body. The jury is the tribunal under our legal system to decide that type of issue. To withdraw such questions from the jury is to usurp its function. *Bailey v. Central Vermont Railway*[, *Inc.* (1943),] 319 U.S. 350[, 87 L. Ed. 1444, 63 S. Ct. 1062]." *Ney*, 2 Ill. 2d at 84, 117 N.E.2d at 80.

■ All the doctors who testified agreed that a delay in treatment is generally harmful, and it is best to render medical assistance as soon as possible. Even defendant's expert, Dr. Case, agreed with this general statement. While some doctors could not determine whether a delay in treatment aggravated Mitch's injuries, Dr. Boeren concluded that delay was indeed a proximate cause of Mitch's injuries.

Dr. Boeren opined that Mitch was suffering from moderate-to-severe dehydration when he first examined him during the early morning hours of April 29. There was testimony adduced that Mitch's dehydration and electrolyte imbalance were caused by a delay in treatment which might or could have aggravated his condition:

"Q. (Mr. Sterling [plaintiff's counsel]:) And do you have an opinion, doctor, based upon a reasonable degree of medical certainty, based upon the history that was given to you, based upon the exam that you conducted and the various tests that you performed, do you have an opinion as to what effect if any the dehydration that you diagnosed in Mitch might have had on his brain?

A. I think it may have—if Mitch already had an altered state of consciousness, I think dehydration would aggravate that. If he was having difficulty raising secretions or coughing and was not breathing deeply, dehydration would thicken his lung secretions, make them more difficult to cough up and increase the likelihood of pneumonia. Electrolyte imbalance can have an adverse effect on brain function. Beyond that I really can't speculate.

\* \* \*

Q. And do you have an opinion based upon a reasonable degree

of medical certainty as to whether the electrolyte imbalance that was found might or could have caused or contributed to the brain damage that was—that's been diagnosed in Mitch Urbas?

* * *

A. My feeling is that Mitch Urbas suffered some sort of neurologic or brain insult, injury, infection or toxin which then rendered him unable to drink and he also became dehydrated. I think dehydration was secondary to something else before that but assuming that there was some sort of neurologic injury or some sort of brain injury or impairment, adding the insult of dehydration on top of that could worsen it.

Q. All right. Now doctor, I want you to assume that on April 27th, 19—April 28th, 1988 it was a clear day, Mitchell Urbas was in a car facing west. The car was light green on the bottom and had a dark green vinyl top. That the high temperature during the day was somewhere between sixty-seven and sixty-nine degrees. And then when Mitch was found, he was dressed in a long john top, a tuxedo coat and shirt and a winter police type jacket and I want you to assume further that the car seats were light green but darker than the car. The seats were made out of material and not vinyl. The dash was a dark green and the police officer who found Mitch indicated that as he opened the door, the heat rolled out of the car. And I want you to assume further all of the physical findings that you saw and observed on Mitch and the test results that you had run; do you have an opinion based upon a reasonable degree of medical certainty as to whether the failure of Mitchell Urbas to receive some sort of medical attention for a period of perhaps twenty-four hours might or could have aggravated his medical conditions?

* * *

A. All right. In review, and I may have failed to mention this earlier in this deposition, Mitch Urbas, when he was taken to St. Mary's Hospital and also when he arrived at St. Elizabeth's Hospital, had a fever. To the best of my recollection it was approximately one hundred one or one hundred two degrees fahrenheit temperature. Certainly I'm no physicist and I'm unable to tell you how hot the temperature may have risen in an automobile such as you described but certainly if it was out in the sun, I imagine it could get very warm in such a car. An elevated temperature from whatever reason, if Mitch had a viral infection and had a fever, the mere presence or the mere having of a fever increases water loss by evaporation as the body tries to cool itself to lower the fever. It's a normal physiological response. So even if you're in comfortable room temperatures, if a person has a fever,

we don't know—at that time we know Mitch had a fever when he got to the hospital; we don't know if he had a fever before that. But if he had a fever before that, just having a temperature would increase his water requirements or his water losses through evaporation. If a person had a fever and if he was placed in an environment that had an elevated ambient temperature or room temperature or temperature within a car, that would further increase his body core temperature and would further cause further water loss through evaporation and cooling efforts of the body and that could increase both his body temperature and water losses and dehydration. Now the human brain can withstand temperatures pretty well. And most of us, if we get a fever or if our children get a fever of one hundred one or one hundred two or one hundred three, it's frightening to us but probably doesn't do any damage to the brain. If you start getting temperatures of the body one hundred five and above, it certainly can be damaging to an otherwise normal brain. If a brain were injured because of infection, toxin, trauma or other things, then it might theoretically be subject to injury at temperatures less than one hundred five or one hundred six degrees.

Q. (Mr. Sterling:) All right. Now so then, doctor, do you have an opinion under those circumstances that the failure to render or a delay in the rendering of some sort of medical assistance might or could aggravate a condition—

\* \* \*

A. Referring back to my immediately past statement, depending upon the length of time a person were in that car and depending upon the ultimate temperatures obtained in the car, I believe that those set of circumstances and conditions that you described could or might have aggravated his conditions."

Our review of the evidence indicates that the most logical explanation for what happened initially is that Mitch suffered some type of seizure of unknown origin, not drug or alcohol induced, which rendered him unable to seek assistance. Mark Prosser, a licensed EMT who found Mitch, opined:

"Based on my observations when I located Mitch, on the heat coming out of both the vehicle and the clothing around Mitch, the fact that he was, did not appear to be abused in any way, it was my opinion that he had probably lied [sic] there in the sun all day."

Dr. Ullah, the emergency room doctor, found red excoriated areas at Mitch's waistline that he believed were caused by lying in the same position for a period of 8 to 12 hours or more. Dr. Boeren found bruising and some blood-filled blisters on Mitch's upper sacral area

which he opined were probably caused by applying pressure to that area for a 24-hour period. Dr. Welch agreed that a person would have to be in a stationary position for 12 to 24 hours in order to suffer pressure necrosis such as Mitch suffered. Dr. Prosser discussed the decubitus ulcers which developed in the same general area in which Dr. Boeren observed the bruising and blistering. In other words, Mitch was in the same position for a long period of time. Only Dr. Case, an expert hired by defendant, testified to the contrary that such markings could have developed in a relatively short period of time. The jury was aware that Mitch was in a dark car, facing the sun, and dressed in heavy clothing, with the passenger window rolled down only three to five inches, so that the heat "rolled out" of the car at 10:30 p.m. when he was found. Add to this Dr. Boeren's testimony about how dehydration was the secondary cause of Mitch's injuries, and plaintiff has made a submissible case for the jury's determination on the question of defendant's negligence in not finding Mitch and such delay being a proximate cause of Mitch's injuries.

## D. DAMAGES

■ Defendant further contends that plaintiff failed to prove damages because plaintiff provided the jury with no appropriate way to assess a portion of Mitch's injuries attributable to defendant's negligence. In a subsequent portion of its brief, defendant contends that the initial incident which allegedly left plaintiff helpless was a preexisting condition and defendant's failure to find Mitch and render assistance aggravated that condition. An aggravation of a preexisting ailment or condition is recognized as a separate element of compensable damages in Illinois. (*Behles v. Chicago Transit Authority* (1952), 346 Ill. App. 220, 231, 104 N.E.2d 635, 640.) Damages are a question of fact for the jury, and courts are reluctant to interfere with a jury's exercise of discretion in this area. (*Chambers v. Rush-Presbyterian-St. Luke's Medical Center* (1987), 155 Ill. App. 3d 458, 467, 508 N.E.2d 426, 432.) We believe that plaintiff made a case for proximate cause submissible to the jury and that Dr. Boeren's testimony discussing how a delay in treatment aggravated Mitch's condition supports the award of damages in this case.

## E. WORKERS' COMPENSATION

Defendant next contends that the workers' compensation defense should have been submitted to the jury, as it involved questions of fact for the jury's determination. Defendant argues that the facts of this case made alternative pleading necessary, asserting that if Mitch left the parking lot on the night in question, the negligence action

failed, and if Mitch never left the parking lot, the case still fails because of the affirmative defense of workers' compensation. We do not agree with defendant's position and find no error in the trial court's refusal to submit workers' compensation instructions to the jury.

"The Workers' Compensation Act provides employers with a defense against any action that may be asserted against them in tort, but that defense is an affirmative one whose elements—the employment relationship and the nexus between the employment and the injury—must be established by the employer, and which is waived if not asserted by him in the trial court." (*Doyle v. Rhodes* (1984), 101 Ill. 2d 1, 10, 461 N.E.2d 382, 386.)

An injury will be found to be compensable, in a workers' compensation context, if it "aris[es] out of and in the course of the employment." (820 ILCS 305/2 (West 1992).) "Arising out of" refers to the causal connection between the employment and the accidental injury, which exists when the injury's origin is in some risk related to the employment. (*Scheffler Greenhouses, Inc. v. Industrial Comm'n* (1977), 66 Ill. 2d 361, 366, 362 N.E.2d 325, 327.) The requirement that the injury occur "in the course of" employment is concerned with the "time, place, and circumstances of the injury." (*Scheffler Greenhouses, Inc.*, 66 Ill. 2d at 366, 362 N.E.2d at 327.) An injury will generally be found to arise "in the course of the employment when it occurs within the period of employment at a place where the employee may reasonably be in the performance of his duties, and while he is fulfilling those duties or engaged in something incidental thereto" and necessarily includes a reasonable time before commencing and after concluding actual employment. *Chmelik v. Vana* (1964), 31 Ill. 2d 272, 278, 201 N.E.2d 434, 438.

■ In the present case, Tom Kelly, Mitch's supervisor for the evening, was adamant that Mitch was relieved of his duties and left the premises at approximately 10:30 p.m. on April 27. Even assuming that Mitch did not leave the parking lot, as Kelly testified, we believe the evidence established that Mitch was relieved of his duties or abandoned those duties on April 27. Evidence was presented that Mitch was not paid for the date of April 28. Moreover, Mitch was found in his car, not a place where a member of the courtesy patrol would reasonably be in the performance of his duties. The markings found on Mitch's body indicated he was in the same position for an extended period of time and, as such, presents a contrary situation from those where an employee is injured within a "reasonable" time before or after work and such injury can be said to arise out of and in the course of employment. (See, *e.g.*, *Christman v. Industrial Comm'n*

(1987), 159 Ill. App. 3d 479, 512 N.E.2d 804; *Chmelik v. Vana* (1964), 31 Ill. 2d 272, 201 N.E.2d 434.) Additionally, applying our supreme court's analysis in *Brady v. Louis Ruffolo & Sons Construction Co.* (1991), 143 Ill. 2d 542, 578 N.E.2d 921, the injury Mitch sustained did not arise out of his employment. In *Brady*, the claimant was working at a drafting table attached to his office wall when a truck left the highway, hit the building, and caused severe injuries to claimant from the table puncturing his abdomen. The arbitrator determined that the injuries were not compensable, reasoning that the claimant's employment did not expose him to risk greater than the general public's risk, so the injuries did not arise out of his employment. The Industrial Commission, the circuit court, and the appellate court agreed. Our supreme court explained the applicable rules of law as follows:

> "To be compensable under the Workers' Compensation Act, an employee's injury must arise out of and in the course of his employment. (See Ill. Rev. Stat. 1987, ch. 48, par. 138.1.) 'Arising out of' refers to the causal connection between the employment and the injury. The causal connection is demonstrated if the claimant establishes that the injury's origin lies in some risk related to the employment. (*Paganelis v. Industrial Comm'n* (1989), 132 Ill. 2d 468, 480[, 548 N.E.2d 1033]; *Scheffler Greenhouses, Inc. v. Industrial Comm'n* (1977), 66 Ill. 2d 361, 366[, 362 N.E.2d 325].) In addition, an injury may be said to arise out of the employment if the conditions or nature of the employment increases the employee's risk of harm beyond that to which the general public is exposed. (*Caterpillar Tractor Co. v. Industrial Comm'n* (1989), 129 Ill. 2d 52, 58[, 541 N.E.2d 665]; *Campbell '66' Express, Inc. v. Industrial Comm'n* (1980), 83 Ill. 2d 353[, 415 N.E.2d 1043].) 'In the course of employment' refers to the time, place, and circumstances under which the injury is received. (*Scheffler Greenhouses*, 66 Ill. 2d at 366-67[, 362 N.E.2d 325].) A claimant has the burden of establishing the necessary causal relationship between the employment and the injury. (*Caterpillar Tractor*, 129 Ill. 2d at 63[, 541 N.E.2d 665]; *Rosenbaum v. Industrial Comm'n* (1982), 93 Ill. 2d 381, 386[, 444 N.E.2d 122].) Each claim for compensation must be determined on its own facts. (*Campbell '66' Express*, 83 Ill. 2d at 357[, 415 N.E.2d 1043].) ***

\* \* \*

The mere fact that claimant was present at the place of injury because of his employment duties will not by itself suffice to establish that the injury arose out of the employment. (*State House Inn v. Industrial Comm'n* (1965), 32 Ill. 2d 160[, 204 N.E.2d 17]; *Illinois Country Club, Inc. v. Industrial Comm'n* (1944), 387 Ill. 484[, 56

N.E.2d 786].) Rather, a claimant must demonstrate that his risk of the injury sustained is peculiar to his employment, or that it is increased as a consequence of the work. (*Orsini v. Industrial Comm'n* (1987), 117 Ill. 2d 38[, 509 N.E.2d 1005]; *Chmelik v.' Vana* (1964), 31 Ill. 2d 272[, 201 N.E.2d 434].) If an industrial accident is caused by a risk unrelated to the nature of the employment, or is not fairly traceable to the workplace environment, but results instead from a hazard to which the claimant would have been equally exposed apart from his work, the injury cannot be said to arise out of the employment. (*Material Service Corp. v. Industrial Comm'n* (1973), 53 Ill. 2d 429[, 292 N.E.2d 367].)" *Brady*, 143 Ill. 2d at 547-50, 578 N.E.2d at 923-24.

Applying *Brady* to the case at bar, we conclude that Mitch's injuries were not sustained in the course of his employment (see discussion above) and did not arise out of his employment. There is no causal connection between his injury and some risk related to his employment. The link between defendant and plaintiff's injuries rests on the actions of defendant's courtesy patrol. In this regard, Mitch was in no greater position of risk or danger than any other member of the general public at defendant's establishment. Accordingly, defendant has failed to show Mitch's injuries arose out of his employment.

Defendant has failed to establish a nexus between Mitch's employment and his injury, which it was required to do prior to instructions on a workers' compensation defense being submitted to the jury. Accordingly, we find no error in the trial court's refusal to submit the instructions.

## F. DIRECTED VERDICT/JUDGMENT *N.O.V.*

■ After reviewing the record as a whole and following the *Pedrick* standard, we find that plaintiff made a submissible case on the issue of negligence for the jury's determination. The fact that the jury decided in favor of the other defendant in this case, Hal Lowrie, is also significant, because it shows that the jury followed the court's instructions and that the verdict was not the result of antipathy toward defendant or the nature of defendant's business.

## G. QUOTIENT VERDICT

Defendant next contends that the verdict rendered was the result of an impermissible quotient process and, as such, defendant is entitled to a new trial on all issues. Plaintiff responds that defendant failed to prove by clear and convincing evidence that a quotient verdict was rendered and, at best, the method described in four jurors' affidavits amounts to permissible "experimentation" in arriving at their verdict.

The law is clear that when a jury agrees in advance to arrive at a verdict by averaging, the verdict thereafter rendered is improper. (*Illinois Central R.R. Co. v. Able* (1871), 59 Ill. 131.) However, in order to establish that a void quotient verdict was rendered, an advance agreement must be shown. (*German v. Illinois Power Co.* (1983), 115 Ill. App. 3d 977, 986-87, 451 N.E.2d 903, 909-10.) The jury may experiment by considering average figures. *Kelley v. Call* (1944), 324 Ill. App. 143, 57 N.E.2d 501.

■ In the instant case, the jury was polled prior to being dismissed at defendant's request, and all 12 stated that the verdict was his or her verdict. (See *German*, 115 Ill. App. 3d at 987, 451 N.E.2d at 910.) However, defendant's post-trial motion included the affidavits of four jurors which stated:

"2. In order to reach its verdict as to Saintco, Inc., in the case, the jury agreed that as to each separate element of damage listed on the verdict form, each juror would write down what the juror thought was Saintco's percentage of negligence as to that element of damage. As to each element of damage, the 12 assigned percentages were then added together and divided by 12, in order to reach an average percentage for that element of damage. The average percentage was then multiplied by the amount which the plaintiff's attorney *** requested in his final argument in order to reach an amount for that element of damage. The same procedure was followed for each of the separately listed elements of damage on the verdict form."

Upon the trial court's denial of defendant's post-trial motion, defendant failed to request an evidentiary hearing. (See *Department of Transportation v. Graham* (1985), 130 Ill. App. 3d 589, 474 N.E.2d 810 (wherein the defendant did request an evidentiary hearing).) Moreover, defendant in its brief admits that "certain aspects of the procedure employed by the jury herein may be subject to several interpretations." Under such circumstances, defendant has failed to prove an impermissible quotient verdict was used, and we refuse to disturb the jury's verdict on these grounds.

## H. JURY INSTRUCTIONS

■ Defendant further contends that the trial court erred in instructing the jury on the issue of duty in this case and in refusing to instruct the jury on defendant's defense under the Workers' Compensation Act and in refusing defendant's special interrogatories regarding its affirmative defense. We need only address defendant's arguments regarding the duty instruction, as we previously determined that no error occurred because of the trial court's refusal to instruct the jury on defendant's affirmative defense of workers'

compensation. Defendant specifically contends that plaintiff's instruction No. 13D and plaintiff's instructions No. 28 and No. 29 assume that the general-duty instruction applied in this case and ignored the limited nature of the duty herein—the hours the courtesy patrol was in operation. However, because defendant's own instruction, No. 7A, clearly sets forth the limited nature of the duty, we find that the jury was adequately instructed on the limited nature of defendant's duty.

## I. EXCESSIVE VERDICT

■ Defendant next contends that the damages returned by the jury were excessive because plaintiff failed to prove that any damages were proximately caused by defendant's negligence as opposed to the initial injury or insult. Accordingly, defendant contends that a verdict of nearly $1.4 million is excessive. We previously determined that plaintiff did make a submissible case to the jury on the issue of defendant's negligence. Mitch's injuries were quite severe and the elements of damages were attested to by Mitch's treating physicians, Mitch's rehabilitation nurse, and Dr. Grossman, plaintiff's expert economist. Thus, we do not agree that the damages returned by the jury were excessive.

## J. RESTRICTIONS ON CROSS-EXAMINATION OF PLAINTIFF'S ECONOMIST

■ Defendant also asserts that the trial court erred in limiting defendant's cross-examination of Dr. Grossman, who testified regarding Mitch's lost income and lost future income. The trial court specifically prohibited defendant from discussing the adverse effect of Mitch's prior felony conviction for armed robbery and use of a deadly weapon for which he was sentenced to concurrent terms of $8^{1}/_{2}$ years in the Nevada State Prison. We have reviewed the offer of proof and must agree with the trial court that the information concerning Mitch's prior conviction would have only served to prejudice Mitch's case. In the offer of proof, Dr. Grossman testified that while it is generally true that a criminal conviction damages one's employability and earning potential, he believed his calculations in the instant case were correct notwithstanding Mitch's prior conviction. This was so because Dr. Grossman based his predictions on future income substantially less than that of an average white male because Mitch only earned minimum wage for the year preceding his injury. Moreover, Mitch proved he was employable, albeit at a low wage, by working for defendant after his incarceration. Consequently, we find no error in the trial court's refusal to allow Dr. Grossman to be cross-

examined about the effect of Mitch's prior conviction on his employability.

## K. TESTIMONY OF MARK PROSSER

■ The final contention raised by defendant is that the trial court erred in permitting Mark Prosser to express an opinion as to the cause of Mitch's condition. Defendant contends Mark Prosser was not qualified to render an expert opinion, as he failed to possess the skills necessary to form an expert opinion. Defendant cites *Hawkins v. Richardson* (1975), 29 Ill. App. 3d 597, 331 N.E.2d 201, which held that the plaintiff's testimony that glasses prescribed by defendant "caused" his headaches was improper expert testimony. In that case, however, it was clear that the plaintiff had no optical training. It is true that in order to testify as an expert, it must be shown that such person possesses "special skills beyond the ken of the average juror and that he employed those skills in forming an opinion." (*Galindo v. Riddell, Inc.* (1982), 107 Ill. App. 3d 139, 146, 437 N.E.2d 376, 382.) In the present case, Prosser was not qualified to give opinions on the amount of time that plaintiff had remained in the car, and the trial court erred in admitting that opinion. We conclude, however, that the admission of Prosser's opinion was harmless error because it was cumulative of the opinions of both Dr. Ullah and Dr. Boeren.

For the foregoing reasons, the judgment of the circuit court of St. Clair County entered upon a jury verdict in plaintiff's favor is affirmed.

Affirmed.

RARICK and CHAPMAN, JJ., concur.