Bryant MOORE, Jr., by his next friend and father, Ryant MOORE, Sr., Plaintiff/Respondent,

v.

BI–STATE DEVELOPMENT AGENCY, Defendant/Appellant.

No. ED 79994.

Missouri Court of Appeals, Eastern District, Division Four.

July 16, 2002.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 22, 2002.

Application for Transfer Denied Nov. 26, 2002.

James E. Whaley, Thomas Michael Ward, Law office of Brown & James, St. Louis, for Appellant.

John D. Warner, Jr., Law firm of Gault & Warner, St. Louis, for Respondent.

SHERRI B. SULLIVAN, P.J.

*Introduction*

Bi–State Development Agency (Bi–State) appeals from a jury verdict and trial court judgment entered in favor of Bryant Moore, Jr. (Moore), by and through his next friend and father Bryant Moore, Sr., on his petition for damages for personal injuries alleging that Bi–State failed to discharge Moore from its bus in a safe place. We affirm the trial court judgment and dismiss Moore's cross-appeal.

*Factual and Procedural Background*

In preparation for our analysis of Bi–State's points on appeal, we present the evidence and all reasonable inferences to be drawn from the evidence in the light most favorable to Moore. Fourteen-year-old Moore was a high school freshman at Collinsville High School in Collinsville, Illinois. To attend an early college preparatory class at school, Moore rode a Bi–State bus to the school at around 6:15 a.m., and he was usually the only passenger on the bus at that time. Typically, Moore requested the bus driver to drop him off across from a service road leading to the school's rear entrance.[1] Bi–State had a company policy instructing its bus drivers to make such requested stops for the convenience of its passengers if the bus driver determined he could safely do so. On the northeast corner at the end of the school

---

1. If Moore failed to request the stop, the bus driver would not stop until an intersection with a three-way stop about 800 feet to the south.

service road, which made a "T" intersection with Caseyville Road, a two-lane road with a speed limit of forty-five miles per hour, a light standard lit Caseyville Road from east to west.

On January 25, 1999, it remained dark until about 6:30 a.m. At about 6:20 a.m., upon approach to Collinsville High School in the southbound lane of Caseyville Road, Moore requested the Bi–State bus driver, who was familiar with Moore and his typical requested stop, to stop the bus across from the service road leading to the school's rear entrance. The driver stopped the bus about forty-five to fifty feet south of the "T" intersection with the school service road and the light standard at a place with minimal road shoulder, composed of loose pebbles and grass, and no sidewalk, crosswalk or intersection.[2] Also at this place, woods and ditches were along the side of Caseyville Road.

Moore exited the bus and walked along the right side of the bus toward the rear of the bus. As he did so, Moore noticed a van waiting about thirty feet behind the bus. Once he had cleared the length of the bus, Moore crossed behind the bus and headed east across Caseyville Road. Simultaneously, a pickup truck was headed northbound on Caseyville Road. The record on appeal does not reveal whether the truck had its headlights on. The van's driver did not observe Moore look to the south for oncoming traffic. Moore took about one and one half steps into the northbound traffic lane when the truck struck him. Moore sustained serious injuries, including brain damage, from the accident.

Moore, by and through his next friend and father Bryant Moore, Sr., filed a petition for damages for personal injuries alleging that Bi–State failed to discharge

Moore from its bus in a safe place. In April 2001, after a jury trial, the jury found in favor of Moore, assessing 51% fault to Bi–State and 49% fault to Moore and finding the total damages of Moore to be $7,750,000. Accordingly, the trial court entered a judgment in favor of Moore and against Bi–State in the amount of $3,952,500. Subsequently, the trial court granted Bi–State's motion for a set-off from the judgment, which reduced the amount of the judgment to $3,890,000. Bi–State filed a Motion for Judgment Notwithstanding the Verdict, or in the Alternative, For New Trial or Remittitur. Moore also filed a Motion for Judgment Notwithstanding the Verdict. The trial court denied both motions.

### Discussion

■ Bi–State raises four points on appeal. Preliminarily, we must first consider choice of law principles. A forum state will always apply forum procedure. *Reis v. Peabody Coal Co.*, 997 S.W.2d 49, 58 (Mo.App. E.D.1999). Thus, Missouri procedural law applies to the issues raised on appeal. The standard of review is a procedural issue, and therefore Missouri law governs the standard of review for the issues raised on appeal. See *Id.* at 59.

■ A forum state will choose the applicable substantive law according to its own conflict of law doctrines. *Id.* at 58. For tort claims, Missouri applies the test set forth in the Restatement (Second) of Conflict of Laws Section 145 (1971). *Id.* Section 145 provides:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship

2. The west edge of Caseyville Road along Collinsville High School was a "wavy manner of pebbles" ranging from about three feet to nonexistent.

to the occurrence and the parties under the principles stated in section 6.

(2) Contacts to be taken into account in applying the principles of section 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

■ Moore's injury occurred in Illinois, the conduct causing Moore's injury occurred in Illinois, and Moore's domicile and residence are in Illinois. Thus, applying the test set forth in Section 145, we conclude, and the parties concur in their briefs, that Illinois substantive law applies to the issues raised on appeal.

In its first two points on appeal, Bi–State argues that the trial court erred in denying its Motion for Judgment Notwithstanding the Verdict because Moore failed to make a submissible case against Bi–State.

■ The standard of review for a trial court's denial of a motion for judgment notwithstanding the verdict is whether the plaintiff made a submissible case. *Coggins v. Laclede Gas Co.*, 37 S.W.3d 335, 338 (Mo.App. E.D.2000). To make a submissible case, a plaintiff must present substantial evidence for every fact essential to liability. *Id.* Substantial evidence is that which, if true, has probative force upon the issues, and from which the trier of fact can reasonably decide a case. *Id.* We view the evidence and all reasonable inferences to be drawn from the evidence in the light most favorable to the plaintiff. *Id.* at 339. We presume that the plaintiff's evidence is true. *Id.* We disregard any of the defendant's evidence that does not support the plaintiff's case. *Id.* However, we do not supply missing evidence or give the plaintiff the benefit of unreasonable, speculative or forced inferences. *Id.* Whether the evidence in a case is substantial and whether the inferences drawn from the evidence are reasonable are questions of law. *Id.*

■ If the plaintiff fails to make a submissible case, then entry of judgment notwithstanding the verdict for the defendant is proper. *Reis*, 997 S.W.2d at 59. Granting a judgment notwithstanding the verdict is a drastic action that should be done only when reasonable persons could not differ on a correct disposition of the case. *Coggins*, 37 S.W.3d at 339. We will not overturn a jury verdict unless there is a complete absence of probative facts to support it. *Id.* Where reasonable minds can differ on the question before the jury, a court may not disturb the jury's verdict. *Id.*

More specifically in its first point on appeal, Bi–State argues that Moore failed to make a submissible case against Bi–State because Bi–State owed Moore no duty at the time of the accident because the carrier-passenger relationship terminated once Moore safely exited the Bi–State bus.

■ Under Illinois substantive law, the existence of a duty is a question of law to be decided by the court. *Crutchfield v. Yellow Cab Co.*, 189 Ill.App.3d 1091, 137 Ill.Dec. 200, 545 N.E.2d 961, 963 (1 Dist. 1989). A common carrier owes its passengers the highest degree of care while they are leaving a bus, and that duty continues until passengers have a reasonable oppor-

tunity to reach a place of safety. *Id.* The passenger to whom the carrier owes this duty is one who is in the act of boarding, is upon, or is in the act of alighting from, the carrier's vehicle, and the passenger need not, of necessity, be in actual contact with the vehicle. *Katamay v. Chicago Transit Auth.,* 53 Ill.2d 27, 289 N.E.2d 623, 625 (1972). Once a passenger has a reasonable opportunity to reach a place of safety, the carrier only has a duty of ordinary care. *Id.* Proof establishing a failure to provide a safe place to alight constitutes negligence. *Miskunas v. Chicago Transit Auth.,* 42 Ill.App.3d 202, 355 N.E.2d 738, 740 (1 Dist. 1976).

■ Viewing the evidence in the light most favorable to Moore, the evidence at trial revealed that, upon approach to Collinsville High School in the southbound lane of Caseyville Road, Moore requested the Bi–State bus driver, who was familiar with Moore and his typical requested stop, to stop the bus across from the service road leading to the school's rear entrance. The bus driver, under circumstances within his control, discharged Moore about forty-five to fifty feet south of the "T" intersection with the school service road and the light standard at a location with minimal road shoulder, composed of loose pebbles and grass, and no sidewalk, crosswalk or intersection. It was dark at the time the driver discharged Moore from the bus.

Further, and significantly, the bus driver conceded that if he stopped the bus at such a location, then Moore would not have reached a place of safety until he got to the other side of the road because he would have had to cross a lane of traffic in the dark. Thus, the location where the bus driver discharged Moore was not "as reasonably safe as the circumstances permitted." Cf. *Sims v. Chicago Transit Auth.,* 4 Ill.2d 60, 122 N.E.2d 221, 224 (1954).

We find that Moore made a submissible case against Bi–State because Bi–State's duty under the carrier-passenger relationship continued until Moore had a reasonable opportunity to reach a place of safety and sufficient evidence existed to conclude that Moore did not have such an opportunity. Accordingly, the trial court did not err in denying Bi–State's Motion for Judgment Notwithstanding the Verdict. Bi–State's point one on appeal is denied.

More specifically in its second point on appeal, Bi–State argues that Moore failed to make a submissible case against Bi–State because Bi–State's conduct was not the proximate cause of Moore's injuries. Rather, Bi–State maintains that the proximate cause of Moore's injuries was his conduct in running across the street from a place of safety into the path of the truck.

■ Under Illinois substantive law, to be held liable for negligence, there must be a causal connection between a common carrier's negligence and a passenger's injury. *Lutz v. Chicago Transit Auth.,* 36 Ill.App.2d 79, 183 N.E.2d 579, 581 (1 Dist. 1962). For there to be a causal connection, the negligence of the carrier need not be the only cause, nor the last or nearest cause of the passenger's injury. *Id.* It is sufficient if it concurs with some other cause acting at the same time, which in combination with it causes the injury. *Id.* Where the concurrent negligence of two persons causes an injury that could have been avoided but for the negligence of either, the negligence of each is the proximate cause. *Id.* at 581–82.

■ In a negligence case, the question of proximate cause is generally one for the jury to decide. *Roeseke v. Pryor,* 152 Ill.App.3d 771, 105 Ill.Dec. 642, 504 N.E.2d 927, 931 (1 Dist.1987). A jury's findings will be upheld unless those findings are

contrary to the manifest weight of the evidence. *Id.*

Viewing the evidence in the light most favorable to Moore, Moore presented evidence sufficient to raise the factual question of whether the bus driver failed to discharge Moore in a safe place. The jury determined that he had so failed, and we will not disturb the jury's decision because we do not find a complete absence of probative facts sufficient for overturning the jury's verdict. The element of causation continued until Moore had a reasonable opportunity to reach a place of safety.

Bi–State suggests that the accident would have occurred even if the bus driver had discharged Moore across from the school service road and the light standard because Moore still would have had to cross the street. Obviously, the jury did not agree with this view of the occurrence in reaching its conclusion that Moore had not reached a place of safety where the bus driver discharged Moore from the bus. The lack of light, road shoulder, sidewalk, crosswalk, or intersection and the bus driver's concession that Moore would not have reached a place of safety until he got to the other side of the road all support the jury's conclusion. Further, the jury took into account Moore's negligence in not looking for oncoming traffic by assessing a percentage of fault in its verdict.

We find that Moore made a submissible case against Bi–State because the jury's findings regarding proximate cause were not contrary to the manifest weight of the evidence. Accordingly, the trial court did not err in denying Bi–State's Motion for Judgment Notwithstanding the Verdict. Bi–State's point two on appeal is denied.

In its third point on appeal, Bi–State argues that the trial court erred in denying its Motion for New Trial because of juror misconduct during voir dire in that jury foreperson Marian Shands's (Shands)

failure to disclose three claims against Bi–State when questioned about claims during voir dire constitutes intentional nondisclosure of prior claims.

■■■■ The findings of the trial court in ruling on a motion for new trial based on juror misconduct are given great weight and will not be disturbed on appeal unless the trial court abused its discretion. *Alcorn v. Union Pacific R.R. Co.*, 50 S.W.3d 226, 246 (Mo. banc 2001). Courts should not overturn a jury verdict lightly. *Keltner v. K–Mart Corp.*, 42 S.W.3d 716, 722 (Mo.App. E.D.2001).

■■■■ Nondisclosure can occur only after a clear question on voir dire unequivocally triggers the venireperson's duty to respond. *Id.* at 723. Thus, the first question that must be answered by a trial court in determining if juror nondisclosure has occurred is: was the question the juror is alleged to have failed to answer clear? *Id.* Our review of the clarity of questions on voir dire is de novo. *Id.* The standard for clarity is whether a lay person would reasonably conclude that the undisclosed information was solicited by the question. *Id.* at 726. How a reasonable lay person interprets the meaning of a question depends not only on the words used, but also on the context. *Id.* If a question is not clear, there has been no nondisclosure, intentional or otherwise. *Id.* at 727.

During voir dire, the following exchanges occurred:

> [Shands]: ... Some years ago, I did have a claim against Bi–State which I dealt with. But I do not think it would have any bearing on making a fair decision in this case.

> [Moore's Counsel]: I'm sorry, I didn't hear the last part you said.

[Shands]: I don't think it would have any bearing on me making a fair decision in this case.

[Moore's Counsel]: Could you tell me a little bit about your case? What was the case about?

[Shands]: There was an accident on Whitier and Finley some years ago, and they had to put a whole body brace on me. I had to go to the hospital and spend many hours. I did have an attorney. They did settle the case.

. . .

[Moore's Counsel]: Does anyone, as we're sitting here right now, have a Bi-State bus pass or have you had one, say within the last year?

. . .

[Shands]: Yes, I do purchase Bi-State bus passes, and I do ride it on a daily basis. It would not affect the impartial decision on my part.

. . .

[Moore's Counsel]: Now, some of you people may have told me some of this just in passing when we started discussing some of these things, which in any event you don't need to tell me again. But I want to find out if anybody's been involved in any prior lawsuits as either the plaintiff, that is, the person bringing the lawsuit, or the defendant, the person who has been sued?

The Court: Ladies and Gentlemen, let me emphasize at this point, I want you to give a lot of thought with respect to this question. You need to answer the question. If you feel like you can't answer the question in open court, again, come to the side of the bench and I'll permit you to give your answer outside the hearing of the other jurors. Counsel, would you ask the question again and explain exactly what it is that you're looking for from these jurors.

[Moore's Counsel]: Ladies and Gentlemen, what we're looking for here is to know if you've ever been a party to a lawsuit, that is, the plaintiff, the person bringing the lawsuit, suing the other person, or the defendant, the person who has been sued or is defending the lawsuit. And I'll stretch it a little bit so that we don't have to keep going back. This would include you or an immediate family member or close friend. . . .

. . .

[Shands]: As I mentioned before, the Bi-State incident. But, also, I've sued the City of St. Louis twice.

[Moore's Counsel]: For what?

[Shands]: Workmen's comp.

[Moore's Counsel]: That's right, you work for the City of St. Louis?

[Shands]: Formerly. I used to work for the City.

[Moore's Counsel]: What do you do now?

[Shands]: I work in security.

[Moore's Counsel]: Thank you. Anything about those lawsuits that will make it so you can't hear this case fairly?

[Shands]: Absolutely not.

. . .

[Moore's Counsel]: . . . My next question—I know some of you already told me some of this information—have you ever been involved in a situation where you have had to make a claim for a personal injury or something else, or somebody has made a claim against you that didn't get all the way to be a lawsuit? It was just a claim? They were claiming that you had caused an accident or what have you?

. . .

[Bi-State's Counsel]: . . . Anybody— any member of your family, you or a member of your family, ever injured

while getting on a bus or getting off a bus, deboarding or boarding?

. . .

[Bi–State's Counsel]: We've gone over a lot of the questions that [Moore's counsel] has asked, and I probably asked some of them, also. We've talked about whether you or any member of your family were a plaintiff and brought a lawsuit. We talked about that in quite a lot of detail. I just want to go back to that to make sure that there isn't somebody that thought of something or forgot something or hasn't told us about something that they know about, whether you or any member of your family has been a plaintiff in a lawsuit. . . .

Ms. Shands, you indicated that you presently are a plaintiff, you have a case against Bi–State?

[Shands]: Not presently, no. That was in the past.

[Bi–State's Counsel]: How long ago?

[Shands]: Five, six, seven years ago.

[Bi–State's Counsel]: You could put that aside and just judge this case—

[Shands]: Absolutely.

[Bi–State's Counsel]: Absolutely?

[Shands]: Yes.

[Bi–State's Counsel]: Got your word on that?

[Shands]: Oh, yes.

. . .

[Bi–State's Counsel]: . . . Anybody else that I might not have—that I missed that were a plaintiff in a lawsuit for personal injuries, you or a member of your family?

. . .

[Bi–State's Counsel]: Let's go one step further, and they talked about it before, about claims. Any claim that you've thought of that you haven't told us about, a claim where you were asking for money damages—you didn't go so far as to get a lawyer and file a lawsuit or go to court and be a plaintiff, but you just made a claim against somebody for injuries that you sustained that you haven't told us about? Anybody?

. . .

[Bi–State's Counsel]: Anybody else about any claim that you've thought about or brought to mind that might affect you here or you haven't told us about? Not just affect you here, but you haven't told us about?

. . .

[Bi–State's Counsel]: Anyone else thought of something that comes to mind as we think of things? Anybody else?

. . .

[Bi–State's Counsel]: One more time. Any other claims we haven't talked about. Got them all, right?

At the hearing on Bi–State's motion, Shands testified that she had never been injured boarding or unboarding a bus and that the Bi–State accident to which she referred during voir dire occurred in February 1990. With prompting from Bi–State's counsel, Shands also testified that she could not recall filing a claim against Bi–State in July 1994 regarding a fall on a bus; however, she did recall calling and notifying Bi–State of the fall, but she stated no action was ever taken. She also recalled signing a release and accepting a settlement of $150 with which she was satisfied.

Again with prompting from Bi–State's counsel, Shands testified that although she reported a fall on a bus in April 1997, she never made a claim against Bi–State or received a settlement. Shands further testified after prompting that in May 1999, she reported to Bi–State an incident in which she got sick from bus fumes while

on a bus. Shands initially stated that she did not recall receiving a settlement in the matter, but she later testified that she was satisfied with the $50 settlement that she received from Bi–State and that she signed a release. She stated her actions regarding this incident were "an effort to improve the services of Bi–State to the citizens of St. Louis."

Shands testified that she had forgotten about the three incidents identified above until raised by counsel during the hearing because they were "just things where [she] reported things to Bi–State." She also testified that she reported the July 1994 incident to Bi–State "for the betterment of services for the citizens of St. Louis, and they made an offer." She did not say "pay me for this or pay me for that." She stated that she disclosed what she remembered at the time of voir dire. She stated that the February 1990 incident was the most serious incident. She also stated that the incident reports did not affect her ability to hear the case and judge it fairly.

■ We do not find that the questions unequivocally triggered Shands's duty to respond. Shands's incident reports to Bi–State were not lawsuits in which she was either the plaintiff or the defendant nor did she consider them claims against Bi–State for which she was asking money. Further, the incidents did not involve injury while getting on or off a bus. Shands could reasonably have concluded that the undisclosed information was not solicited by the questions, and therefore, we conclude that the questions were not clear.

■ Even if the questions were clear, we must determine if nondisclosure occurred. In its Order denying Bi–State's Motion for New Trial, the trial court found that "the record does not support a finding that this is a case involving intentional nondisclosure that warrants the granting of a new trial." We review a determina-

tion of intentional or unintentional nondisclosure for abuse of discretion. *Keltner*, 42 S.W.3d at 723.

■ Intentional nondisclosure occurs: (1) where there exists no reasonable inability to comprehend the information solicited by the question asked of the prospective juror, and (2) where it develops that the prospective juror actually remembers the experience or that it was of such significance that the juror's purported forgetfulness is unreasonable. *Heinen v. Healthline Management, Inc.*, 982 S.W.2d 244, 247–48 (Mo. banc 1998). A finding of intentional nondisclosure is tantamount to a per se rule mandating a new trial. *Id.* at 248.

■ Unintentional nondisclosure exists where the experience is insignificant, remote in time or when the venireperson reasonably misunderstands the question. *Keltner*, 42 S.W.3d at 723. If nondisclosure is unintentional, a new trial is not warranted unless the party seeking a new trial proves prejudice that may have influenced the verdict. *Heinen*, 982 S.W.2d at 250. Prejudice does not occur where the information not disclosed does not bear on the case or on the venireperson's ability to fairly evaluate the evidence. *Keltner*, 42 S.W.3d at 724.

■ In its Order denying Bi–State's Motion for New Trial, the trial court found the following:

Ms. Shands reported having filed a lawsuit against [Bi–State], reported filing two workers' compensation claims against her employer, and acknowledged that she rode [Bi–State's] buses on a daily basis and purchased bus passes. Ms. Shands did not respond during voir dire with any information about her reports of incidents in 1994, 1997, and 1999 in which she apparently suffered minor

injuries, and received a total of $200 from an adjuster without filing a claim or contacting an attorney. At the post-trial hearing she acknowledged the reports when prompted, but appeared not to recall how much money, if any, she received in response to her reports and the amount of money involved was minimal.

The record supports the trial court's findings. Shands testified that she had forgotten the apparently minor incidents and that she had disclosed the relevant information that she had recalled at the time of voir dire. It is reasonable that Shands remembered some of the details about the incidents when presented questions directed specifically toward the incidents at the hearing. Additionally, Shands may reasonably have misunderstood the questions relating to claims because, again, she did not consider the incident reports to be claims against Bi–State. She also stated that the incident reports did not affect her ability to hear the case and judge it fairly. Further, Shands did not sign the verdict form in the case, indicating that she did not agree with the verdict. Thus, we find neither intentional nor unintentional nondisclosure occurred by Shands.

In its Order denying Bi–State's Motion for New Trial, the trial court also identified another reason for rejecting the juror misconduct claim that is worthy of mention. In *Doyle v. Kennedy Heating and Service, Inc.*, 33 S.W.3d 199 (Mo.App. E.D. 2000), we stated the following:

> [G]ranting a motion for new trial in these types of situations are (sic) not favored, especially when the lawyers could have prevented this by bringing forth their allegations prior to jury deliberation, so that the jurors involved could be replaced with alternates. It does not make sense, with respect to judicial economy, to wait until after trial,

to bring allegations of juror's intentional nondisclosure of material information.

. . .

> It appears this is becoming a strategy for sandbagging by losing parties. We strongly encourage parties who have information about possible allegations of juror's intentional nondisclosure prior to jury deliberation to bring it forth before the case is given to the jury.

*Id.* at 201–202.

■■■ The trial court found the following:

> Here, the information [Bi–State] relies on in support of its claim of juror misconduct is information that was in defendant's own records, and was thus in defendant's possession and control. . . . Under such circumstances, the Court believes [Bi–State] could have and should have come forward with the information in a more timely manner.

We agree with the trial court. At the hearing on Bi–State's motion, Bi–State's claims supervisor testified that Bi–State's computer system "immediately" can generate a list of claims against Bi–State using a person's name, but she did not take this action until after the trial.

Accordingly, because we find that the voir dire questions were unclear and even if they were clear, that no intentional or unintentional nondisclosure occurred, the trial court did not abuse its discretion in denying Bi–State's Motion for New Trial for juror misconduct. Bi–State's point three on appeal is denied.

In its fourth point on appeal, Bi–State argues that the trial court erred in denying its Motion for New Trial because the trial court committed prejudicial and reversible error in submitting Instruction No. 5, Moore's verdict-directing instruction, in that the instruction did not specify in the first paragraph in what manner

Moore's place of discharge from the bus was unsafe.

Instruction No. 5 provided in relevant part:

In your verdict your (sic) must assess a percentage of fault to [Bi–State] whether or not [Moore] was partly at fault if you believe:

First, [Bi–State] failed to discharge [Moore] in a safe place, and

Second, [Bi–State] was thereby negligent, and

Third, such negligence directly caused or directly contributed to cause damage to [Moore].

 The form of a jury instruction is a procedural matter, and thus Missouri law applies. *Meredith v. Missouri Pac. R.R. Co.*, 467 S.W.2d 79, 82 (Mo.1971). Whether or not a jury was properly instructed is a question of law. *Hosto v. Union Elec. Co.*, 51 S.W.3d 133, 142 (Mo. App. E.D.2001). Rule 70.02(b)[3] provides:

Form of Instructions. Whenever Missouri Approved Instructions [MAI] contains an instruction applicable in a particular case . . ., such instruction shall be given to the exclusion of any other instructions on the same subject. Where an MAI must be modified to fairly submit the issues in a particular case, . . ., then such modifications . . . shall be simple, brief, impartial, free from argument, and shall not submit to the jury or require findings of detailed evidentiary facts.

 A proper instruction submits only the ultimate facts, not evidentiary details, to avoid undue emphasis of certain evidence, confusion, and the danger of favoring one party over another. *Duren v. Union Pac. R.R. Co.*, 980 S.W.2d 77, 79 (Mo.App. E.D.1998). We have not fash-

ioned precise, universally applicable definitions to explicitly differentiate evidentiary facts from ultimate facts; rather, we determine the ultimate facts on a case-by-case basis. *Stalcup v. Orthotic & Prosthetic Lab, Inc.*, 989 S.W.2d 654, 658 (Mo. App. E.D.1999). The test is whether the instruction follows the substantive law and can be readily understood by the jury. *M.C. v. Yeargin*, 11 S.W.3d 604, 616 (Mo. App. E.D.1999). When reviewing claimed instructional error, we view the evidence most favorably to the instruction, disregard contrary evidence, and reverse where the party challenging the instruction shows that the instruction misdirected, misled, or confused the jury. *Id.* at 615. Even with a deviation from MAI, we may not reverse unless there is a substantial indication of prejudice. *Linton v. Missouri Highway and Transp. Comm'n*, 980 S.W.2d 4, 10 (Mo.App. E.D.1998).

 Instruction No. 5 is a modified version of MAI 17.01 and 37.01. Bi–State argues that the first paragraph of this instruction gave the jury a "roving commission" to find Bi–State at fault. An instruction is a roving commission if it assumes a disputed fact or submits an abstract legal question that allows the jury "to roam freely through the evidence and choose any facts which suited its fancy or its perception of logic" to impose liability. *Duren*, 980 S.W.2d at 79. If the instruction fails to advise the jury what acts or omissions of the party, if any, found by them from the evidence, would constitute liability, then it may be considered a roving commission. *Id.*

 The first paragraph did not remove from the jury's consideration a disputed fact. Rather, it presented the jury with an ultimate issue: whether or not Bi–State failed to discharge Moore in safe

**3.** All rule references are to Mo. R. Civ. P.2002, unless otherwise indicated.

place. The failure to discharge in a safe place is an ultimate issue, not the reasons causing the place to be unsafe. Further, the paragraph did not submit an abstract statement of the law. "A safe place" is not a scientific phrase requiring expertise that the jury lacked nor is it ambiguous, confusing, or infrequently used. See *Stalcup*, 989 S.W.2d at 659. We also note that the bus driver, Bi–State's own employee, conceded that the place where Moore's evidence shows Moore was discharged was unsafe. Thus, Bi–State has not shown that the instruction misdirected, misled, or confused the jury or that prejudice resulted from the instruction.

Accordingly, because we find that Instruction No. 5 did not grant the jury a roving commission and that it complies with Rule 70.02(b), the trial court did not err in denying Bi–State's Motion for New Trial for instructional error. Bi–State's point four on appeal is denied.

### Cross-appeal

In his brief, Moore raises one point on cross-appeal. After we docketed the case and prior to Moore filing his brief, Bi–State's counsel notified this Court that Moore had filed a cross-appeal. We had not received any notice of appeal regarding a cross-appeal by Moore.

According to the record on appeal, the judgment that forms the basis for this appeal became final on August 9, 2001. Bi–State filed its notice of appeal and paid the $50 docket fee on August 15, 2001. Moore filed a notice of appeal on August 17, 2001.[4] However, Moore did not file a docket fee with his notice. On April 12, 2002, we issued an Order to Show Cause directing Moore to supplement the record on appeal with proof of payment of the docket fee for his Notice of Appeal and to show cause why his cross-appeal should not be dismissed for lack of jurisdiction for an untimely notice of appeal. In his Response to Order to Show Cause, Moore argued that Rule 81.04 does not require a docket fee to be filed for a cross-appeal. Moore also indicated that he paid a $50 docket fee on April 4, 2002; however he provided no proof of payment. For purposes of this appeal, we will presume Moore paid the docket fee as he indicated.

We have a duty to determine our jurisdiction sua sponte. *Sassmann v. Kahle*, 18 S.W.3d 1, 2 (Mo.App. E.D.2000). The timely filing of an adequate notice of appeal is a jurisdictional requirement. *Application of Holt*, 518 S.W.2d 451, 453 (Mo.App.1975). The Missouri Supreme Court has held that there is no valid filing of a notice of appeal until the docket fee is paid. *Kattering v. Franz*, 360 Mo. 854, 231 S.W.2d 148, 150 (1950).[5] In so holding,

---

**4.** The docket sheets in the legal file indicate that Moore filed a "notice of filing notice of cross-appeal" on August 17, 2001. A certified copy of Moore's actual notice of appeal appears in the legal file; however it is not date-stamped. On April 11, 2002, the City Clerk's Office forwarded to this Court a copy of Moore's Notice of Filing Notice of Cross-appeal, which is date-stamped August 17, 2001. Also on April 11, 2002, the City Clerk's Office forwarded to this Court a copy of Moore's Notice of Appeal, which is date-stamped April 4, 2002, by the trial court clerk. A typewritten phrase appears at the top of the notice stating "ORIGINALLY FILED AUGUST 17,

2001." It is unclear who placed this phrase on the notice. Moore's Response to Order to Show Cause includes an exhibit that suggests that the Notice of Appeal was attached to the Notice of Filing Notice of Cross-appeal at the time the latter was date-stamped August 17, 2001. Therefore, for purposes of this appeal, we will treat Moore's Notice of Appeal as having been filed on August 17, 2001.

**5.** In its opinion, the Court noted that one of the purposes of the 1943 Code of Civil Procedure was to speed up litigation in that under the old Code, appeals would be allowed by

the Court relied on Section 847.129 Mo. R.S.A., a predecessor to Section 512.050 RSMo. (2000), and Rule 3.28 adopted by the Court to determine what is a valid filing of a notice of appeal, which makes an appeal effective. *Id.* Section 847.129 provided: "The docket fee of $10.00 in the appellate court shall be deposited . . . with the clerk of the trial court at the time of filing the notice of appeal." Rule 3.28 provided: "No notice of appeal shall be accepted and filed by the clerk of any trial court unless the appellate court docket fee, required by Section 129, 1943 Act, is deposited therewith."

In 1997, the Missouri legislature deleted the following sentence from Section 512.050: "The docket fee of ten dollars in the appellate court shall be deposited with the clerk of the trial court at the time of filing the notice of appeal." We surmise that this deletion was in response to the 1996 legislative enactment of Chapter 488 entitled "Court Costs," which contained all sections relating to court costs. Section 488.012.3(8) sets the cost for appeals at $50 pursuant to Section 483.500. Section 488.018.3 provides in relevant part:

> The supreme court may establish and provide for by rule such accounting guidelines, procedures, forms, controls and reviews relating to the collection, deposit, payment and disbursement of all court costs collected pursuant to sections 488.010 to 488.020.

Further, Missouri Rule of Civil Procedure 81.04 provides in relevant part:

> . . .

(b) Cross-appeals. If a timely notice of appeal is filed by a party, any other party may file a notice of appeal within ten days of the date the first notice of appeal was filed.

(c) Docket fees. The appellate court docket fee is fifty dollars. It shall be paid to the trial court clerk when the notice of appeal is filed. The trial court clerk shall remit the docket fee to the appellate court clerk or as otherwise provided by law.

No trial court clerk shall accept or file a notice of appeal unless:

(1) The docket fee is deposited therewith; or

(2) The appellant is not required by law to pay the docket fee; or

(3) An order permitting the appellant to prosecute the appeal *in forma pauperis* accompanies the notice of appeal.

■ Additionally, Section 512.070 provides that at the same time the trial court clerk notifies the parties of the filing of a notice of appeal, "the clerk shall mail a copy of the notice of appeal to the clerk of the appellate court together with a docket fee deposited by appellant." The procedural requirements of this section should be taken "with all reasonable diligence and dispatch," and the trial court clerk should not be "stayed, swayed or dissuaded" from the faithful discharge of his or her responsibility for satisfying those requirements.

---

trial courts without payment of docket fees. *Id.* at 149. The Court stated:

These cases could not be filed in the appellate courts until the docket fee was paid and it often became necessary for the respondent to pay the docket fee to get a dismissal. When the respondent did not do so, many cases remained suspended for years between the trial court and the appel-

late courts. This condition made it impossible to know the true condition of appellate court dockets as such cases might come in at any time, and it was unfair to the winning party to thus prevent the final determination of the case. This condition also made it very difficult for appellate courts to keep their dockets current.

*Id.*

*Petition of Union Elec. Co.,* 356 S.W.2d 300, 302 (Mo.App.1962).

Reading the above-cited sections together with Rule 81.04, we continue to hold that no valid filing of a notice of appeal occurs until the docket fee is paid. To hold otherwise, would be to resume the practice in place prior to the new Code, addressed by the Court in *Kattering,* and "would have such disastrous results to impede the prompt administration of justice." *Kattering,* 231 S.W.2d at 149.

Further, Rule 81.04(c) requires a docket fee to be paid to the trial court clerk when a notice of appeal is filed. A cross-appellant is required to file a notice of appeal as well. Rule 81.04(b). Logically then, the same requirements that apply to the filing of an initial notice of appeal apply to a cross-appellant's notice of appeal, including the filing of an accompanying docket fee. Thus, the docket fee is a jurisdictional requirement even in the filing of a notice of appeal for a cross-appeal.[6]

Presuming Moore filed a notice of appeal on August 17, 2001, the earliest Moore filed a docket fee was April 4, 2002, almost eight months after the judgment became final. The record does not reveal that Moore was excused by law from paying the docket fee. Nor does the record include an order permitting Moore to prosecute the appeal *in forma pauperis* accompanying the notice of appeal. Consequently, having not timely paid the docket fee with his notice of appeal, Moore did not file a valid notice of appeal. Our jurisdiction depends on the timely filing of a notice of appeal and lacking that our only permissible action is to dismiss the appeal. *Griffin v. Griffin,* 982 S.W.2d 788 (Mo. App. E.D.1998). Accordingly, Moore's point on cross-appeal is stricken from his brief, and his cross-appeal is dismissed for lack of jurisdiction for an untimely notice of appeal.

### Conclusion

The judgment of the trial court is affirmed and Moore's cross-appeal is dismissed.

LAWRENCE E. MOONEY, J., concurs.

LAWRENCE G. CRAHAN, J., dissents in a separate opinion.

LAWRENCE G. CRAHAN, Judge, dissenting.

I respectfully dissent. Under Illinois law, Bi–State had completely discharged its duty as a common carrier at the time the accident occurred. Even if it initially discharged the Plaintiff in an arguably unsafe place, Plaintiff had reached a place of safety where he was in no danger of being struck by Mr. Crowell's truck. Had Plaintiff simply waited for the traffic to clear, he could have safely crossed Caseyville Road, which was lightly traveled at the time of day when the accident occurred. Therefore Bi–State's conduct was not the proximate cause of the accident. Moreover, because the verdict director would have permitted the jury to impose liability for breach of a duty Bi–State did not have under Illinois law, it was an improper roving commission.

---

**6.** The rationale discussed in *Kattering* supports this conclusion as well. For example, suppose an appellant files a notice of appeal and pays the docket fee and, for whatever reason, the appeal is dismissed. If a cross-appellant had filed a notice of appeal without paying the docket fee, the notice would remain at the trial court, leaving the appellate court unaware of its existence, and the circumstances of concern addressed in *Kattering* would exist.

The bus on which Plaintiff was a passenger was not a school bus. It was a twenty-four foot passenger bus which carried passengers on a specified route for a standard fare. Passengers were discharged from the bus at designated bus stops, at stop signs or at locations along the route expressly requested by the passenger if the bus driver felt he could safely do so.

Plaintiff had been taking this particular bus for several weeks and, at that time of the morning, was usually the only passenger. Driver recalled that the first time he had Plaintiff as a passenger, he simply pulled the cord without saying anything to indicate where he wanted to get off, so Driver proceeded to the intersection of Caseyville Road and Morrison Road, where there is a stop sign. At one time, the intersection had a sign designating it as a bus stop but the sign had been removed. From this location, Plaintiff would have to either walk northbound on Caseyville Road just under a half mile to a service road leading to the school or walk about 800 feet east on Morrison Road to the front entrance to the school. The school is in a largely rural area and there are no curbs or sidewalks along Caseyville Road.

Thereafter, Plaintiff would specifically request the driver to stop about 800 feet sooner, where the service road leading to the school intersected with the east side of Caseyville Road. Because the scheduled bus route carried the bus southbound on Caseyville Road and the bus could only discharge passengers on the right side of the road, the driver would discharge the Plaintiff, at his request, on the west side of Caseyville Road, on the shoulder, and Plaintiff would then cross Caseyville Road and proceed to school on the service road. A streetlight is located on the north side of the service road across from the location Driver would typically discharge Plaintiff.

Driver testified that on the morning in question, he dropped Plaintiff off in the usual location across from the service road. He looked in his mirror, saw that Plaintiff was clear of the door and walking on the shoulder toward the rear of the bus and turned his attention to merging back into traffic. He never saw or heard the accident and continued on his normal route.

Mr. Aburto ("Eyewitness") had a somewhat different version, although as discussed below, the differences are immaterial. According to Eyewitness, he was following the bus down Caseyville Road when it activated its flashers and stopped to discharge Plaintiff. Eyewitness stopped his vehicle about 30 feet behind the bus, which he indicated discharged Plaintiff about 45–50 feet south of where the Driver said he discharged him. He said conditions were between light and dark; headlights were on but one wouldn't need a flashlight to see. The bus was completely on the paved portion of the road. He saw Plaintiff exit the bus. As to Plaintiff's actions thereafter, Eyewitness testified:

Q. Okay. And what did he do as he got out of the bus?

A. Just walked behind the bus.

Q. All right. Did he walk—can you describe the pace that he walked? Did he first walk along the side?

A. Yes, walked on the side of the bus and then came behind the bus.

Q. Did he walk along the pavement or on the grass?

A. He was walking on the grass.

Q. Did he, as he walked along the grass, was he walking at a fast pace or a slow pace or a normal pace?

A. I'd say a normal pace.

Eyewitness testified that as Plaintiff reached the back of the bus and began to cross, the bus started moving forward.

Plaintiff looked at Eyewitness until he was about halfway across the southbound lane, then looked straight ahead and quickened his pace. He never looked to the right and was struck by Mr. Crowell's vehicle about 1½ paces into the northbound lane.

In its first point, Bi–State maintains that the relationship of carrier and passenger had terminated when Plaintiff safely got off the bus and proceeded to walk on the grass shoulder off the roadway and that it therefore owed Plaintiff no duty under Illinois law at the time the accident occurred. Under Illinois law, the existence of a duty is a matter of law to be determined by the court. *Urbas v. Saintco, Inc.,* 264 Ill. App.3d 111, 201 Ill.Dec. 782, 636 N.E.2d 1214, 1223 (1994). Recovery under a negligence theory requires the existence of a duty to conform to a certain standard of conduct to protect another from an unreasonable risk of harm. *Id.* Bi–State concedes that, as a common carrier, it owes its passengers the highest degree of care as they are leaving a bus and that the duty continues until the passenger has a reasonable opportunity to reach a place of safety. *Crutchfield v. Yellow Cab Co.,* 189 Ill. App.3d 1091, 137 Ill.Dec. 200, 545 N.E.2d 961, 963 (1989). The passenger to whom the duty of care is owed is one who is in the act of boarding upon, is upon, or is in the act of alighting from, the carrier's vehicle. *Katamay v. Chicago Transit Authority,* 53 Ill.2d 27, 289 N.E.2d 623, 625 (1972) (citing Illinois Pattern Jury Instructions–Civil (2d ed.1971), No. 100.09).

However,

> [t]he duty to select a safe place for passengers to board or alight from street cars does not require the carrier to protect such passengers from obvious street dangers, such as those which arise from the operation of other vehicles on the street or from ordinary obstructions, defects, or unevenness of the surface of the street, at the place where the car is stopped. A fortiori, the carrier is not required to exercise a high, or the highest, degree of care to prevent injury to an alighting passenger by reason of conditions existing on the surface of the street at the point where he alights.

*Kiesel v. Chicago Transit Authority,* 6 Ill. App.2d 13, 126 N.E.2d 170, 172 (1955) (quoting 13 C.J.S. Section 733, pp. 1378–79).

In *Crutchfield,* the injured party, as in this case, was a student riding a regular city bus on a scheduled route to attend a function at her school. 137 Ill.Dec. 200, 545 N.E.2d at 962. The bus left her off at a designated bus stop in the middle of the block across the street from the school. *Id.* The bus stop was in a vacant, unimproved area except for streetlights and fencing. *Id.* There was no crosswalk or traffic signal. *Id.* The roadway consisted of two lanes of traffic in either direction divided by a median. *Id.* The student stepped off the bus and walked around the front of the bus where she was struck by a taxi cab in the adjacent lane. *Id.* In affirming summary judgment for the bus company, the court held that once the student safely disembarked from the bus, the bus company had fully performed its duty and no longer had a duty to exercise a higher standard of care. *Id.* at 963. The court further rejected the plaintiff's contention that the bus company could be held liable because the bus obstructed the student's view of traffic in the adjacent lane. *Id.* Holding that there was no duty to immediately move the bus to permit a clear view of the roadway, the court observed that the bus company had no duty to protect its passengers from obvious street dangers. *Id.* (citing *Kiesel*).

Similarly, in *Mitchell v. City of Chicago,* 221 Ill.App.3d 1017, 164 Ill.Dec. 506, 583

N.E.2d 60 (1991), the court affirmed summary judgment in favor of the bus company in an action by a passenger who was struck by a car while crossing the street from a mid-block bus stop in order to catch an elevated train for which he held a transfer. *Id.* at 61. Despite the fact that the passenger had purchased a transfer to ride on a train also operated by the same company and was proceeding directly from one conveyance to the other, the court held that the carrier's duty to exercise the highest decree of care was suspended once it discharged the passenger at the intermediate point and that it owed the passenger no duty to protect him from obvious street dangers. *Id.* at 62. (citing *Crutchfield* and *Kiesel*).

Plaintiff dismisses *Crutchfield* and *Mitchell* on the grounds that, in both cases, the passengers were discharged at a designated bus stop. Aside from the presumed presence of a sign designating the area as a bus stop, there is little to distinguish the location where Plaintiff was discharged in this case from the location described in Crutchfield as "vacant and unimproved except for streetlights, fencing and a service building." 137 Ill. Dec. 200, 545 N.E.2d at 962. In any event, *Sims v. Chicago Transit Authority*, 4 Ill.2d 60, 122 N.E.2d 221 (1954), cited by Plaintiff, establishes that it is immaterial whether the place of discharge is a designated bus stop. All that Illinois law requires is that the location be one in which the passenger is in no immediate danger from traffic in adjacent lanes.

In *Sims*, the plaintiff was a passenger on a southbound streetcar which stopped behind 15 other streetcars due to an accident on a street ahead, although southbound vehicular traffic to the right of the streetcar was moving freely. 122 N.E.2d at 222. The place the streetcar came to a stop was about 1 1/3 blocks north of the regular stop. *Id.* The plaintiff got off the streetcar at the front and crossed between the streetcar and the one ahead in order to cross to the east side of the street. *Id.* The plaintiff stopped between the streetcars when suddenly a northbound streetcar approached at a speed of 20 miles per hour without sounding any warning. *Id.* The plaintiff threw her hands in the air and screamed. When she did so, she was struck on the wrist by a steel ventilator projecting from the northbound train and was knocked to the ground, causing severe injuries. *Id.* at 222–23. The plaintiff argued that there was no reasonably safe way to proceed, that her status as a passenger therefore continued until she had a reasonable opportunity to reach a place of safety and that the defendant owed her the highest degree of care. *Id.* at 223–24. The defendant maintained, despite the fact that the plaintiff would have to cross either the southbound lane of vehicular traffic or the northbound lanes of streetcar and vehicular traffic, she was discharged from the streetcar in a place of safety where she would not have been hit had she remained there and consequently its duty was fully performed. *Id.* at 224. The Illinois Supreme Court held that, although the place where the plaintiff was discharged was not unequivocally safe, it was as reasonably safe as circumstances permitted. *Id.* Accordingly, the court held that the plaintiff ceased to be a passenger and that the defendant only owed her a duty of ordinary care. *Id.*[1]

1. Although the court found the plaintiff did not make a submissible case for breach of the defendant's duty to her as a passenger, the plaintiff was ultimately held to have made a submissible case against the defendant for negligence in the operation of the northbound streetcar.

Likewise in this case, Bi–State discharged Plaintiff in an area that was as reasonably safe as the circumstances permitted. The uncontroverted evidence establishes that Plaintiff safely alighted from the bus and he was observed to be walking normally on the grass beside the road, where he was in no danger from traffic on Caseyville Road. At that point, Plaintiff ceased being a passenger and Bi–State's duty toward Plaintiff was fully discharged.

The other cases cited by Plaintiff are clearly distinguishable. *Katamay, supra,* involved a fall which occurred on the defendant's elevated train platform when the plaintiff's shoe became stuck in a space between the wooden planks as she was alighting a train. *Pharr v. Chicago Transit Authority,* 123 Ill.App.3d 205, 78 Ill. Dec. 634, 462 N.E.2d 753 (1984) was a suit by a passenger who fell when a bus allegedly started to move as she was in the process of alighting. *Miskunas V. Chicago Transit Authority,* 42 Ill.App.3d 202, 355 N.E.2d 738 (1976) involved a claim by a passenger who fell as she alighted from a bus and was based on violation of a municipal ordinance requiring busses to load and discharge passengers no more than 18 inches from the curb. None of these cases has any application to the facts presented in this appeal.

Plaintiff urges he nevertheless made a submissible case because Driver admitted he did not discharge Plaintiff in a safe place. This is a mischaracterization of Driver's testimony. Driver testified that he discharged the Plaintiff in a lighted area with a shoulder wide enough to accommodate the bus immediately across the road from the area where the service road intersected Caseyville Road. On cross-examination, Driver testified as follows:

Q. And you knew that when he got on the bus that he was going to get off at Morrison or, excuse me, at the rear entrance to the school?

A. Yes, sir.

Q. How did he—if you knew that, if you knew he was going to get off at the rear entrance to the school, did he have to tell you? Did he have to request a stop?

A. Yes, sir. He'd have to.

Q. Still have to?

A. Yes, sir.

Q. Or else you'd take him down to Morrison?

A. I would have took him down to Morrison, yes, sir.

Q. You require that every time he gets on?

A. Yes, sir. That's regular procedure.

Q. Even though you knew where he would get off, you wouldn't just stop there?

A. No, not unless he requested it.

Q. Is it possible, sir, that morning that he didn't say soon enough, "Let me off there," and you went by it?

A. Yes, sir.

Q. That's possible, isn't it?

A. That's possible.

Q. And then you stopped further up the road towards Morrison, right?

A. No, sir. I would have stopped at the stop sign, because that's wooded area and ditches over on that side.

Q. In other words, you think it's inappropriate to let somebody off further up the road?

A. Yes.

Q. You shouldn't let somebody off up here where [Eyewitness] says you stopped, is that right?

A. What do you mean?

Q. Do you recall being here when [Eyewitness] testified?

A. Yes, sir.

Q. Did you see when he put that purple push pin in for your bus?

A. Yes, sir.

Q. Do you feel that that would be an inappropriate place to stop as a bus driver of all your years of experience because there is no shoulder there for them to walk?

A. Yes. But I stopped back here.

Q. I understand that. I asked you if that's an inappropriate place to stop.

A. Yes, sir.

MR. WHALEY: Your honor, let me object. He's not finished with his answer.

THE COURT: Ask him a question, give him a chance to answer.

Q. (By Mr. Gault) Answer the question again, sir?

A. Yes, sir, I wouldn't have stopped there.

Q. But that's not safe, is it?

A. No, it's not.

Q. It's not safe because the boy would have to get out and walk across in the dark, right?

A. Yes, sir.

Q. And he'd have to cross that lane of traffic oncoming?

A. Yes, sir.

Q. And that's 45–miles–an–hour, isn't it?

A. Yes, it is.

Q. And that's unsafe?

A. Yes.

Q. And he wouldn't have reached a place of safety till he got to the other side of the road?

A. Yes.

Plaintiff claims that this exchange establishes that the place Driver discharged him was not a place of safety and that Bi–State's duty to Plaintiff therefor continued until Plaintiff reached the place of safety identified by Driver, which was the other side of the road. This argument is untenable for a number of reasons.

In the first place, wherever Driver discharged Plaintiff, it was not in an area with "no shoulder" as assumed in counsel's questions. Both Driver and Eyewitness observed Plaintiff walking normally on the grass well clear of the bus. Had he simply remained there and waited for traffic to clear before crossing the road, he was in no danger from traffic on Caseyville Road.[2] Therefore, as a matter of Illinois law, he had reached a place of safety and was no longer a passenger. *Sims, supra; Crutchfield, supra; Mitchell, supra.*

Secondly, to extend Bi–State's duty based on the fact that Plaintiff would have to cross Caseyville Road would impose on Bi–State a duty to protect Plaintiff from obvious street dangers—a duty categorically rejected in *Crutchfield* and *Mitchell.*

Third, whether Bi–State had a duty toward Plaintiff under the evidence is a question of law to be determined by the court, not a matter of driver's opinion or a matter for determination by the jury. In each of the cases cited in this opinion, the trial court and, on review, the Illinois Court of Appeals or the Illinois Supreme Court determined for itself what was a place of safety and thus the point at which the Plaintiff could be deemed to be no longer a passenger to whom the carrier owed a duty. The issue for the jury, where the facts were disputed, was the

---

**2.** There is also no evidence of any impediment which would have prevented Plaintiff from walking 50 feet to the north, which would have put him directly opposite the streetlight according to Eyewitness's testimony. Although it was dark, the path would presumably have been illuminated by Eyewitness's headlights, which were on.

factual issue of whether the Plaintiff had reached the place of safety determined by the court. If the evidence was in conflict as to whether the Plaintiff had yet reached what the court considered the place of safety, the issue was for the jury. If the undisputed facts showed the Plaintiff to be clear of the bus or streetcar and in a place where they were out of the path of moving traffic, the carrier's duty owed to the Plaintiff as a passenger was held to be extinguished as a matter of law. In this case the uncontroverted evidence showed Plaintiff to be walking normally on the grass well clear of the bus. Accordingly, he was no longer a passenger and Bi–State's duty was extinguished as a matter of law.

Finally, to define Bi–State's duty in the manner Plaintiff proposes would, as a practical matter, impose on Bi–State a duty it could not reasonably be expected to discharge. Bi–State was not operating a school bus. Once Plaintiff got off the bus, Driver had no lawful authority to direct how or when he should cross the street. Indeed, Driver could well be found to have extended Bi–State's duty beyond that imposed by Illinois law if he attempted to do so. Because Bi–State was not operating a school bus, Driver likewise had no authority to require opposing or overtaking traffic to stop to facilitate Plaintiff's safe passage. Thus, because the bus can only discharge passengers to the right-hand side of the road, the only way Bi–State could safely discharge Plaintiff's proposed duty to see him safely to the other side of the road would be to deviate from its established route by turning into the service road or finding a place to reverse direction and proceed northbound on Caseyville Road. Such duty would turn the notion of common carriage on its head. Under Illinois law, under no circumstances could a carrier be held to a duty to see passengers safely to their destination on the other side of the road from the place of discharge. Bi–State had fully discharged its duty to Plaintiff and was entitled to judgment as a matter of law.

Although extended discussion would serve no useful purpose, Bi–State was also entitled to judgment because the evidence does not support a finding that its conduct in discharging the Plaintiff where it did was the proximate cause of his injuries. Under Illinois law, a proximate cause is one that produces injury through a natural and continuous sequence of events unbroken by any effective intervening cause. *In re Estate of Elfayer*, 325 Ill.App.3d 1076, 258 Ill.Dec. 892, 757 N.E.2d 581, 587 (2001). In this case, Plaintiff's injuries are solely the result of his decision to cross the road when he did and to do so without checking for northbound traffic. There is no evidence whatsoever of any condition existing at the place Plaintiff was discharged which would have compelled him to cross the road immediately as opposed to waiting until the bus drove away so he could see the northbound lane. Bi–State had no control or right to control the timing or manner in which Plaintiff crossed the road. If Bi–State was negligent in discharging him where it did, such negligence cannot as a matter of law be the proximate cause of him being struck by a car in the northbound lane. See *Pharr v. Chicago Transit Authority*, 220 Ill.App.3d 509, 163 Ill.Dec. 211, 581 N.E.2d 162, 168–69 (1991) (No evidence that stopping bus at unauthorized location was proximate cause at injury allegedly caused by bus moving as passenger alighted); *Arbogast v. Fedorchak*, 44 Ill.App.2d 160, 194 N.E.2d 382, 386–87 (1963) (No evidence that bus blocking crosswalk was proximate cause of injury to passenger who made no attempt to use crosswalk).

Finally, assuming for the sake of argument Plaintiff made a submissible case, the

verdict director was an improper roving commission. The verdict director instructed the jury to return a verdict for Plaintiff if it found that Bi–State "failed to discharge Bryant Moore, Jr., in a safe place." Given Driver's testimony set forth above, the jury could well have concluded that a safe place would be across the road or that where he was discharged was unsafe because he had to cross the road. Yet, as discussed above, under Illinois law Bi–State had no duty to protect Plaintiff from the danger inherent in crossing the street. Because the instruction submitted would permit the jury to impose liability for breach of a duty Bi–State did not have, it was an improper roving commission.